**Slip Op. 09-101**
**UNITED STATES COURT OF INTERNATIONAL TRADE**

---

| | : | |
|---|---|---|
| Kahrs International, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 07-00343 |
| v. | : | |
| | : | Before: |
| United States, | : | Gregory W. Carman, Judge |
| | : | |
| Defendant | : | |
| | : | |

---

[*Held: Plaintiff's motion for leave to file a sur-reply is denied; Defendant's motion to dismiss Plaintiff's Seventh Cause of Action and all "reasonable care" claims in Plaintiff's Complaint is granted; Defendant's motion to strike certain allegations in Plaintiff's complaint is denied; Defendant's cross-motions for summary judgment on the First and Second Causes of Action are granted; Defendant's motion for summary judgment on the Third, Fourth, and Sixth Causes of Action is granted; and Plaintiff's motions for summary judgment on the First and Second Causes of Action are denied. Request for oral argument is denied.*]

Law Offices of George R. Tuttle, A.P.C. (Carl D. Cammarata, George R. Tuttle, and Stephen P. Spraitzar) for Plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Cottet), for Defendant.

**OPINION & ORDER**

September 18, 2009

**CARMAN, JUDGE:** In this omnibus Slip Opinion, the Court entertains and decides the following motions: (1) Defendant United States' ("Government") motion to dismiss the Seventh Cause of Action and all "reasonable care" claims in Plaintiff's complaint,

pursuant to USCIT R.12(b)(1) and R.12(b)(5); (2) motion to strike certain allegations contained in Plaintiff's complaint, pursuant to USCIT R.12(f); (3) Plaintiff's motion for leave to file a sur-reply to Defendant's motion to dismiss; (4) Plaintiff's motion for summary judgment on the First Cause of Action in its complaint, pursuant to USCIT R.56; (5) Defendant's cross-motion for summary judgment on the First Cause of Action in Plaintiff's complaint, and motion for summary judgment on the Third, Fourth and Sixth Causes of Action in Plaintiff's complaint, pursuant to USCIT R.56; (6) Plaintiff's motion for summary judgement on the Second Cause of Action, pursuant to USCIT R.56; and (7) Defendant's cross-motion for summary judgment on the Second Cause of Action, pursuant to USCIT R.56.

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(a) (2000). For the reasons set forth below, the Court (i) denies Plaintiff's motion for leave to file a sur-reply; (ii) grants Defendant's motion to dismiss Plaintiff's Seventh Cause of Action; (iii) denies Defendant's motion to strike; (iv) grants Defendant's cross-motion for summary judgment on Plaintiff's First and Second Causes of Action; (v) grants Defendant's motion for summary judgment on Plaintiff's Third, Fourth and Sixth Causes of Action; (vi) denies Plaintiff's motions for summary judgment on the First Cause of Action; and (vii) denies Plaintiff's motions for summary judgment on the Second Cause of Action.

## PROCEDURE & BACKGROUND

Plaintiff Kährs International, Inc. ("Kahrs") is the U.S. division of AB Gustaf Kähr the Swedish parent company founded in 1857 and Europe's largest wood flooring manufacturer.[1] Kahrs is a Pennsylvania corporation with its principal place of business located in Florida. (*See* Complaint ("Compl.") ¶ 2; *see also* n.1, *supra*.) Kahrs is the owner and importer of record of the six entries[2] of merchandise that are the subject of this action (the "subject merchandise"), alternatively described as "engineered wood flooring panels" or "pre-finished flooring strips."[3] Kahrs' six entries were imported via the Port of Los Angeles/Long Beach and classified by the importer under subheading 4418.30.00 of the Harmonized Tariff Schedule of the United States ("HTSUS") (Compl. Exhibits ("Ex.") 2-7). This duty-free provision is for "Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes: parquet panels." 4418.30.00 HTSUS (2006). Following importation and entry of Kahrs' merchandise, the United States Customs and Border Protection ("CBP" or

---

[1]*Website* AB Gustaf Kähr *available at* http://www.kahrs.com/global/Consumer/AboutKahrs/history (*last visited* Sept. 8, 2009).

[2]Entry # 701-5216140-5 (9/14/06); Entry # 701-5216149-6 (9/20/06); Entry # 701-5216163-7 (9/20/06); Entry # 399-0411896-3 (9/26/06); Entry # 399-0808699-2 (2/24/06); and Entry # 399-0807626-6 (11/05/05).

[3]For consistency, this Court will adopt the term "engineered wood flooring" for the products at issue in this action.

"Customs") issued successive notices of action ("CF-29s") on each entry and subsequently liquidated them under Heading 4412 ("Plywood"), at the duty rate of 8% *ad valorem*, on or between October 27, 2006 and February 16, 2007.[4] Kahrs subsequently filed a protest with CBP, Protest Number 270407-101011, which was denied on August 15, 2007 (Compl. Ex. 1A).

On September 12, 2007, Kahrs commenced its lawsuit against the United States challenging the denial of its protest over the "liquidation, classification, duties, and fees assessed on the pre-finished, veneered, hardwood, flooring strips," imported by Kahrs. (Compl. p.1.) The Government filed its Answer to the Complaint on February 14, 2008. Kahrs' Complaint sets forth seven causes of action.

In the First Cause of Action, Plaintiff alleges that certain "prior rulings and decisions," which it claims permitted Kahrs to classify "imported shipments of similar or substantially identical [engineered wood flooring]" as "parquet panels under 4418.30.0000, HTSUS," were unlawfully revoked by CBP's issuance of certain CF-29's, because such revocation violated the notice and comment provisions of 19 U.S.C. § 1625(c) (2006). (Compl. ¶¶ 1-29.)

---

[4]Notices of Action issued to Kahrs regarding: Entry # 399-0808699-2 on 8/16/06 and liquidated on 11/03/06; Entry # 701-5216140-5 on 10/3/06 and liquidated on 10/27/06; Entry # 701-5216163-7 on 10/11/06 and liquidated on 10/27/06; Entry # 701-5216149-6 on 10/11/06 and liquidated on 10/27/06; Entry # 399-0411896-3 on 10/17/06 and liquidated on 11/3/06; Entry # 399-0807626-6 on 11/27/06 and liquidated on 2/16/07. (*See* Compl.)

The Second Cause of Action in Plaintiff's Complaint alleges that CBP's act of imposing a higher duty for the "imported [engineered wood flooring]" contravened an "established and uniform practice" whereby, as a result of "hundreds of entries of these similar or identical" products made each year for several years prior to August 16, 2006, the agency permitted Kahrs and other importers throughout the U.S. to import "similar or identical [engineered wood flooring] under subheading 4418.30.0000, HTSUS, as parquet flooring panels." (Compl. ¶¶ 30-39.) This imposition of a higher duty by CBP is alleged to have violated the publication requirement of 19 U.S.C. § 1315(d) (2006). (*Id.* at ¶¶ 36-39.)

Plaintiff's Third, Fourth and Sixth Causes of Action allege Kahrs' preferred and alternative classifications of the imported "[engineered wood flooring]" under 4418.30.00 HTSUS ("[p]arquet panels"), 4418.90.20 HTSUS ("edge-glued lumber"), and 4418.90.4590 HTSUS ("builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; other, other"), respectively. (Compl. ¶¶ 40-41 (3d Cause of Action); ¶¶ 42-47 (4th Cause of Action); ¶¶ 63-65 (6th Cause of Action).)

Plaintiff's Fifth Cause of Action, the "Commercial Designation" claim, alleges that "[i]n the wholesale wood flooring trade, the scope of the commercial designation of the term 'plywood' does not include pre-finished multilayer flooring strips." (Compl. ¶ 59.) As a result, Plaintiff contends that its imported products are properly classifiable

duty-free under 4412.29.56 HTSUS ("veneered panels and similar laminated wood.")

(*Id.* ¶ 62.) Resolution of this claim on the merits has been stayed[5] pending the decision

on the balance of the case.

Finally, in Plaintiff's Seventh Cause of Action, Kahrs alleges jurisdiction under 28

U.S.C. § 1581(i) and presents a potpourri of allegations in support of its request for

declaratory relief. (Compl. ¶¶66-75.) Specifically, Kahrs requests, *inter alia*, that this

Court declare as erroneous the denial of its protest by CBP; declare its preferred

classification—4418.30.00 HTSUS—as the correct one; and declare that Kahrs "exercised

reasonable care as required by 19 U.S.C. § 1484 when classifying the subject [engineered

wood flooring] covered by" its protest. (Compl., Prayer for Relief, pp.26-28, and ¶¶66-

75.)

The Government moved (1) to dismiss Kahrs' Seventh Cause of Action for lack of

subject matter jurisdiction, pursuant to USCIT R. 12(b)(1) and for failure to state a claim

upon which relief can be granted pursuant to USCIT R.12(b)(5); and (2) to strike, *inter*

*alia*, certain allegations throughout the Complaint that Kahrs "exercised reasonable

care" in its classification of the imported merchandise. (*See* Defendant's Motion To

Dismiss Part Of This Action And To Strike ("Mot. Dismiss").) Plaintiff opposed these

motions. Both Kahrs and the Government additionally filed separate cross-motions for

---

[5]*See* Stay Order, dated 6/23/09 (Docket #101).

summary judgment,[6] pursuant to USCIT R.56, regarding Plaintiff's First and Second Causes of Action in its complaint. Defendant also pursued summary judgment on the Third, Fourth, and Sixth Causes of Action to Plaintiff's complaint.[7] This Court will first address the Government's motion to dismiss and motion to strike.

## DISCUSSION

## I.    Defendant's Motion to Dismiss and Motion to Strike

### A.    Plaintiff's Sur-Reply Motion

As a preliminary matter, the Court must entertain Plaintiff's Motion For Leave To File Sur-Reply To Defendant's Reply To Plaintiff's Opposition To Defendant's Motion To Dismiss ("Sur-Reply Mot."). Kahrs requests the Court's indulgence and

---

[6]Unfortunately for the Court and the parties involved, Plaintiff chose to litigate its claims one-by-one, in a piecemeal fashion by filing motions for summary judgment separately on each cause of action. Whether by design or by accident, this tactic unnecessarily led to burdensome filings with the Court in the form of unduly large repetitive submissions. While not technically violative of any rule of the court, this method certainly does not keep faith with the provisions of USCIT R. 1 that litigation before this Court be "administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Moreover, piecemeal litigation of this sort is generally disfavored. *See Cuoco v. Moritsugu*, 222 F.3d 99, 110 (2d Cir. 2000). This Court recommends that Plaintiff's counsel review the prescripts of USCIT Rules 1, 81, and the USCIT's Standard Chambers Procedures.

[7]Defendant stylized its motion for summary judgment as a "cross-motion" for summary judgment on Plaintiff's First, Third, Fourth and Sixth Causes of Action. In fact, the Defendants motion for summary judgment on Plaintiff's Third, Fourth and Sixth Causes of Action is a motion for summary judgment in the first instance. Plaintiff has made no objection. For ease of reference, the Court will, where appropriate, cite to the single joint motion paper as Defendant's cross-motion for summary judgment.

moves to file a sur-reply "in order to bring to the Court's attention certain facts that are omitted from Defendant's Reply [to its motion to dismiss] but that are relevant to the issues raised by Defendant and were not previously presented to the Court." (Sur-Reply Mot. 1.) In "the interests of time and ease of administration," Plaintiff filed its proposed Sur-Reply along with its motion. (*Id.*)

The Government objected to Kahrs' motion for a sur-reply and filed opposition papers. ("Def.'s Sur-Reply Op.") Defendant contends that it "did not omit any 'facts' from [its] reply brief which could be pertinent or relevant to the Court's determination" on the Government's motion to dismiss. (Def.'s Sur-Reply Op. 2.) Additionally, Defendant argues that Kahrs has failed to demonstrate a basis for "the extraordinary privilege of filing a sur-reply brief here." (*Id.* at 3.)

The Rules of the U.S. Court of International Trade do not provide for the filing sur-replies to motion papers. *Cf. C.J. Tower & Sons of Buffalo, Inc. v. United States*, 343 F. Supp. 1387, 1394 (Cust. Ct. 1972) (striking sur-reply and noting that sur-replies are "not provided for in the rules"); *see also* U.S. COURT OF INT'L TRADE, RULES AND ANNOTATIONS. Generally, the "decision to permit the filing of a sur reply is purely discretionary and should generally only be allowed when 'a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief.'" *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 Fed. App'x 777, 788 (11th Cir.

2008) (*quoting Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005)). Moreover, as this court has once noted "after [the] issue is properly joined . . . succeeding rebuttal or supplementary briefs normally serve more to relieve the anxieties of counsel than to help the court." *The Newman Co. v. United States*, 57 Cust. Ct. 117, 119 (1966).

This Court finds that, upon on the papers presented, there appears to be no valid basis to grant Kahrs' request for supplementary briefing. Moreover, Plaintiff has had sufficient opportunity via its response papers to respond to the legal issues raised by the Government in its motion to dismiss. Plaintiff's proffered reason for seeking to bring "certain facts" to "the Court's attention" that were allegedly ignored by the Government, is not singularly in accord with this Court's understanding of the case law and this court's rules of practice.

Accordingly, Plaintiff's motion to file a sur-reply is DENIED. *Cf. Saha Thai Steel Pipe Co., Ltd. v. United States*, 661 F. Supp. 1198, 1201 n.5 (Ct. Int'l Trade 1987) ("The court cannot allow the pre-trial . . . process to become needlessly protracted by endless sur-reply briefs."); *see also* USCIT R. 1.

The Court now addresses Defendant's motion to dismiss and to strike.

## B.      Motion to Dismiss

The Government moved separately, under USCIT Rules 12(b)(1) and 12(b)(5), to

dismiss the Seventh Cause of Action in the complaint (Compl. ¶¶ 66-75) in its entirety for lack of jurisdiction under 28 U.S.C. § 1581(i) and/or failure to state a claim upon which relief may be granted. (Mot. Dismiss 1.) The Government also moved to dismiss, under USCIT Rules 12(b)(1) and 12(b)(5), Plaintiff's "reasonable care" "claims" alleged in paragraphs 20, 22, 36, 68, and 72 of the complaint for lack of jurisdiction under 28 U.S.C. § 1581(i) and/or failure to state a claim upon which relief may be granted. (*Id.*) Finally, the Government moved to dismiss, under USCIT Rule 12(b)(1), Plaintiff's "reasonable care" claims alleged in paragraphs 20, 22, and 36 of the complaint for lack of jurisdiction under 28 U.S.C. § 1581(a). (*Id.*)

      1.     Standards of Review

In deciding a USCIT Rule 12(b)(1) motion to dismiss that does not challenge the factual basis for the complainant's allegations, and when deciding a USCIT Rule 12(b)(5) motion to dismiss for failure to state a claim upon which relief can be granted, the Court assumes that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 & n.13 (Fed. Cir. 1993); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

When a defendant challenges the court's jurisdiction, the plaintiff has the burden of demonstrating jurisdiction exists. *See Norsk Hydro Can., Inc. v. United States*, 472 F.3d

1347, 1355 (Fed. Cir. 2006); *see also Len-Ron Mfg. Co., Inc. v. United States,* 24 CIT 948, 959, 118 F. Supp.2d 1266, 1277 (2000). "It is elementary that [t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (internal quotation omitted). The threshold inquiry before the Court is whether subject matter jurisdiction exists over the claims presented. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) (*quoting Ex parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").)

Finally, assuming that all of the factual allegations are true, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotations omitted). Even assuming that all of the factual allegations in the complaint are true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

2.    Parties' Contentions

In Plaintiff's Seventh Cause of Action, Complaint ¶¶66-75, titled "Declaratory

Relief," Kahrs alleges that this Court has jurisdiction pursuant to 28 U.S.C. §§ 1581(i),

1585, 2201 and 2643(c) "as it pertains to administration and enforcement [by CBP] with

respect to the matters specified in the six causes of action set forth [in the complaint]."[8]

(Compl. ¶67.) The essence of Kahrs' Seventh Cause of Action is an application for a

"determination" by the Court that

> Kahrs exercised reasonable care, as specified in 19 U.S.C.
> § 1484, when it classified the [engineered wood flooring] under
> 4418.30.0000, HTSUS . . . and that CBP's actions in changing the
> classification, assessing [higher] duties, threatening penalties,
> and causing actual, immediate and irreparable harm to Kahrs
> by failing to comply with the provisions of both 19 U.S.C.
> §§ 1315(d) and 1625(c), is inconsistent with the plain meaning
> of these controlling provisions and is arbitrary, capricious, an
> abuse of discretion, and not otherwise in accordance with law
> causing Kahrs extraordinary hardship and unusual injury.

(Compl. ¶69.) Kahrs describes with specificity the variety of declaratory relief it seeks

in the Prayer for Relief. (Compl., Prayer For Relief, pp. 26-28.)

The Government argues that this Court lacks jurisdiction under 28 U.S.C.

§ 1581(i) over *any* entry of imported merchandise that are the subject of Protest No.

2704-07-101011 "or any other unidentified entries made between January 2001 and

---

[8]As Defendant correctly point out, §§ 1585, 2201 and 2643(c), invoked by Kahrs as a basis for this Court's jurisdiction, are not actually jurisdictional provisions and cannot create jurisdiction. Only § 1581(i), when properly invoked, provides an appropriate basis for this Court to exercise jurisdiction. *See Miller & Co. v. United States*, 824 F.2d 961, 963 (Fed. Cir.1987) (The shorthand rule provides that the Court's residual jurisdiction under § 1581(i) attaches only if a remedy under another section of 1581 is unavailable or "manifestly inadequate.").

January 2006." (Mot. Dismiss Mem. 14, 20-25.) Moreover, the Court lacks jurisdiction to entertain Plaintiff's "reasonable care claims" under § 1581(i). (*Id.* at 20-25.)

Kahrs "strenuously opposes" Defendant's motion to dismiss. (Pl.'s Response To Def.'s Mot. To Dismiss Part of This Action And To Strike ("Pl.'s Resp. MTD") 1.) While not a model of clarity, the Court was able to extract from Kahrs' response papers the foundation of its opposition. Kahrs contends that § 1581(i) is appropriate as to its Seventh Cause of Action because "jurisdiction under another subsection of Section 1581 is either unavailable or manifestly inadequate." (Pl.'s Resp. MTD Br. 14 (*citing Int'l Customs Products v. United States*, 467 F.3d 1324, 1327 (Fed. Cir. 2006).) Kahrs argues, *inter alia*, that § 1581(a) is jurisdictionally unavailable "to confirm the correctness of its actions," that is, to confirm the propriety of its preferred classification in at least six earlier entries of imports (not the subject imports of *this* action), which it contends established a "prior treatment" or an "established and uniform practice" under 19 U.S.C. §§ 1625(c) or 1315(d) respectively. (Pl.'s Resp. MTD Br. 16-17.) In other words, Kahrs states that its motivation in procuring a declaratory judgment from the court is to confirm that it exercised "reasonable care," thus blunting any future action by CBP that it violated 19 U.S.C. § 1592 (2006)—*i.e.,* as a "defense to an alleged violation of . . . [s]ection 1592." (Pl.'s Resp. MTD Br. 8, 18-19.)

3. <u>Analysis</u>

First, Kahrs concedes that this Court has no jurisdiction under § 1581(a) over any pending or suspended protests (to the extent that there are any) and any entries not covered by the protest identified in the summons in this action. (*See* Pl.'s Resp. MTD Mem. 4; Def.'s Reply To Opp. To Def's Mot. To Dismiss ("Def's MTD Reply Br.") 4.) Put another way, this Court has jurisdiction *only* over the entries that are the subject of this challenge to a denied protest, pursuant to § 1581(a), as indicated in the summons filed with this action.[9] Therefore, to the extent that the Seventh Cause of Action asserts a claim that this Court has § 1581(a) jurisdiction over pending or suspended protests, or any other entries not identified in the summons of this case, such claims are unreviewable and accordingly dismissed pursuant to USCIT R.12(b)(1). *See Dexter v. United States*, 78 Cust. Ct. 179, 181 (1977) ("[T]his court has no jurisdiction" over any entries "[u]ntil the entries are liquidated and [the] protests [are] denied[.]"); *see also* 28 U.S.C. § 2637(a).[10]

Next, the Court notes that § 1581(i)—the residual jurisdiction provision—may

---

[9]As noted above, those entries are: Entry # 701-5216140-5 (9/14/06); Entry # 701-5216149-6 (9/20/06); Entry # 701-5216163-7 (9/20/06); Entry # 399-0411896-3 (9/26/06); Entry # 399-0808699-2 (2/24/06); and Entry # 399-0807626-6 (11/05/05).

[10]"[T]he statutory requirements that a protest must be filed . . . or that duties must be paid before commencing a civil action involving the protest [may not be waived]." *Am. Air Parcel Forwarding Co., Ltd. v. United States*, 6 CIT 146, 150, 573 F. Supp. 117, 120 (1983), *aff'd* 718 F.2d 1546, 1550 (Fed. Cir. 1983).

only be invoked when another subsection of § 1581 is unavailable or the remedy provided by another subsection is "manifestly inadequate."[11] *See Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1557 (Fed. Cir. 1988); *see also Miller & Co. v. United States*, 824 F.2d 961, 963 (Fed. Cir.1987), *cert. denied*, 484 U.S. 1041 (1988). Here, the Court agrees with the Government that Plaintiff has failed to demonstrate that the Court has jurisdiction over the Seventh Cause of Action and the "reasonable care" "claims." (Mot. Dismiss 20-25; Def's MTD Reply Br. 5.) Reviewing this court's central jurisdictional statute, 28 U.S.C. §§ 1581(a)–(i), it is apparent that the court has no jurisdiction to review a "reasonable care" claim by an importer, a claim arising from penalty investigations, or

---

[11]28 U.S.C. § 1581(i) provides:

> (i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section . . . the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers that arises out of any law of the United States providing for—
>
> (1) revenue from imports or tonnage; (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue; (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section . . . .

a pre-enforcement claim. Indeed, 28 U.S.C. § 1582 provides jurisdiction for issues arising from a penalty enforcement action; that is, any claims arising under 19 U.S.C. § 1592.[12] *See Tikal Distrib. Corp. v. United States*, 21 CIT 715, 720, 970 F. Supp. 1056, 1061 (1997) (Section 1582 "provide[s] a complete judicial remedy for those who believe that Customs has wrongfully assessed a penalty. Specifically, the statute allows a party to obtain *de novo* review of a government claim from the Court of International Trade before paying any penalty."). Plaintiff's unsubstantiated assertion that the Court has jurisdiction under § 1581(i) because "no other subsection of § 1581 is available or the remedies afforded by other subsections would be manifestly inadequate," Pl.'s MTD Resp. 25, is insufficient *ipse dixit*. Accordingly, this Court holds that the Government's motion to dismiss Plaintiff's Seventh Cause of Action is GRANTED and Kahrs' "reasonable care" claims are dismissed pursuant to USCIT R.12(b)(1) for want of jurisdiction.

Furthermore, because the Court dismisses in its entirety Plaintiff's Seventh Cause of Action and the "reasonable care" claims for the reasons stated above, the Court need not address the Government's 12(b)(5) issues.

### C.    Motion to Strike

---

[12]Section 1592 gives Customs the authority to impose penalties upon any person who enters merchandise into the United States "by fraud, gross negligence, or negligence . . . ." 19 U.S.C § 1592(a)(1).

The Government also moves this Court, presumably[13] under USCIT R.12(f), for an order striking various and sundry statements, allegations, and claims contained in Kahrs' Complaint.[14] (Mot. Dismiss 1-2, 3 n.1.) Plaintiff opposes this motion and contends that the particular phrases Defendant seeks to strike relate to or parrot various statutory or regulatory language upon which Plaintiff based its Complaint. (Pl.'s MTD Resp. 25-26.)

       1.       Standards of Review

USCIT Rule 12(f) provides that the Court "*may* strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f) also provides that a party may move the court to strike, but such motion must

---

[13]The government did not identify USCIT Rule 12(f) as a basis to move this Court to strike the requested sections of Kahrs' complaint.

[14]Specifically the Government seeks an order "striking: (1) the part of line three in the first full paragraph of the Introduction on p. 2 of the complaint which states "and other substantially identical transactions"; (2) the first two bullet points of the Introduction on p. 3 of the complaint in their entirety; (3) the part of the last full paragraph of the Introduction on p. 3 of the complaint which provides "as well as all other similar or identical merchandise imported by Kahrs from at least January 2001 through 2006"; (4) the part of ¶2 of the prayer for relief in the complaint which requests relief as to "all similar Protests that are pending or suspended hereunder and reliquidate the entries [covered by the pending or suspended protests]"; (5) the part of ¶4 of the prayer for relief in the complaint which requests a judgment from the Court classifying entries which are not encompassed by Protest No. 2704-07-101011 under Heading 4418, HTSUS; (6) ¶10 of the prayer for relief in the complaint in its entirety; and, (7) ¶11 of the prayer for relief in the complaint in its entirety." (Mot. Dismiss 1-2.)

be brought *before* responding to a pleading, or if no response is permitted no later than 20 days after being served with the pleading. USCIT R.12(f)(2).

Here, Kahrs filed its Complaint on September 12, 2007. The Government filed its Answer on February 14, 2008 and filed its motion to strike on September 19, 2008. Mindful of these dates, the Government's motion is not timely and must be rejected. USCIT R.12(f)(2); *see also First Nat'l City Bank v. Burton M. Saks Constr. Corp.,* 70 F.R.D. 417, 419 (D. V.I. 1976) (rejecting as untimely motion to strike filed six months after receipt the pleading).

Furthermore, it is axiomatic that "motions to strike are not favored by the courts and are infrequently granted." *Jimlar Corp. v. United States*, 10 CIT 671, 673, 647 F. Supp. 932, 934 (1986); 5C CHARLES A. WRIGHT & ARTHUR R.MILLER, FEDERAL PRACTICE & CIVIL PROCEDURE § 1380 (2009). The Court will grant a motion to strike only when there is a "flagrant disregard of the rules of court." *Jimlar Corp.,* 647 F. Supp. at 934. The Government's motion to strike is therefore DENIED.

## II. Motions for Summary Judgment

The Court now turns to the Parties' various motions and cross-motions for summary judgment. To summarize the pending motions, Kahrs filed a Motion For Summary Judgment On First Cause of Action (Docket #15) ("Pl.'s Mot. SJ"), pursuant to USCIT R.56(a). The Government responded in opposition and filed a Cross-Motion For

Summary Judgment (Docket # 68) on the First Cause of Action as well as a Motion for Summary Judgment on the Third, Fourth, and Sixth Causes of Action (Docket #68) ("Def.'s X-Mot. SJ").  During the pendency of these motions, Plaintiff filed a Motion for Summary Judgment On Second Cause of Action (Docket #57) ("Pl.'s Mot. SJ 2d") pursuant to USCIT R.56(a).  The Government responded in opposition and filed a Cross-Motion For Summary Judgment on the Second Cause of Action (Docket #80) ("Def.'s X-Mot. SJ 2d").

At the heart of the matter, this action is a classification case.  Therefore, the Court will first address the proper classification of the subject merchandise as raised in the Defendant's motion for summary judgment on the Third, Fourth, and Sixth Causes of Action.  Thereafter, the Court will take up the Parties' cross-motions for summary judgment on the First and Second Causes of Action.

### A.    Standards of Review

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (protest denial jurisdiction).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  USCIT R.56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. The court must view the evidence, draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 259 (internal citation omitted). Accordingly, "a court has an independent obligation to determine, on the basis of parties' submissions, whether a movant is entitled to judgment as a matter of law." *United States v. T.J. Manalo, Inc.*, 26 CIT 1117, 1119, 240 F. Supp.2d 1255, 1257 (2002).

In ruling on cross-motions for summary judgment, if no genuine issue of material fact exists, the Court must determine whether either party "is entitled to judgment as a matter of law." USCIT Rule 56(c); *see also Sea-Land Service, Inc. v. United States*, 23 CIT 679, 684 (CIT 1999), *aff'd*, 239 F.3d 1366 (Fed. Cir. 2001).

In classification cases, "summary judgment is appropriate when there is no genuine dispute as to . . . what the merchandise is . . . or as to its use." *Ero Indus., Inc. v. United States*, 24 CIT 1175, 1179, 118 F.Supp.2d. 1356, 1359-60 (2000).

The parties claim there are no genuine issues as to any material facts; therefore summary judgment is appropriate in this matter. This Court agrees. Where, as here, "the nature of the merchandise is undisputed, . . . the classification issue collapses

entirely into a question of law,"[15] and the court reviews Customs' classification

decisions *de novo*. *Cummins Inc. v. United States,* 454 F.3d 1361, 1363 (Fed. Cir. 2006); 28

U.S.C. § 2640(a)(1) (2000). In making its determination as to the proper classification

under the HTSUS, the Court must consider whether "the government's classification is

correct, both independently and in comparison with the importer's alternative." *Jarvis*

*Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

> **B. Summary Judgment—Undisputed Material Facts**

The following are the undisputed material facts as stipulated by the Parties[16] and

additional undisputed material facts gleaned from the evidentiary record[17] on all

---

[15]Customs' decisions are entitled to a presumption of correctness under 28 U.S.C. § 2639(a)(1) (2000); however, where "a question of law is before the Court on a motion for summary judgment, the statutory presumption of correctness is irrelevant." *Blakley Corp. v. United States*, 15 F. Supp. 2d 865, 869 (CIT 1998) (*citing Universal Elecs., Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997)).

[16]Parties Stipulation of Facts Not in Controversy (Docket # 102) (Parties' Uncontested Facts").

[17]The record assembled on the motions before the Court comprises, *inter alia*:

1. The protest (Compl., Exs. 1A & 1B);
2. The six CF-29s regarding the subject merchandise (Compl., Exs. 2-7);
3. Letter from CBP to Kahrs regarding classification investigation, dated Sept. 29, 2006 (Compl., Ex. 8);
4. Copies of entry documents for the subject merchandise (Pl.'s Mot. SJ, Exs. 2A-2F) (Docket #15);
5. Certain representative samples of the subject imports (Def.'s X-Mot. SJ, Ex. H) (Docket #68) and Pl.'s Mem. In Opp, to Def.'s X-Mot. SJ, Enclosures E-1, E-2, and E-3 (Docket #82) (together "the Representative Samples"));

motions and cross-motions for summary judgment before the Court.

## *Jurisdiction & Background*

1.      This is a civil action which contests the denial of a protest under § 515 of

the Tariff Act of 1930, 19 U.S.C. §1515.  (Parties' Uncontested Facts ("UF") ¶1 (Docket

---

6.      Depositions of Senior Import Specialist Laurel Duvall (Def.'s X-Mot. SJ, Ex. A), Nat'l Import Specialist Paul Garretto (Def.'s X-Mot. SJ, Ex. B), Chief, Cargo Release Branch James Swanson (Def.'s X-Mot. SJ, Ex. C), Senior Vice President, Finance & Operations, Kahrs Int'l Inc., Sean Brennan (Def.'s X-Mot. SJ 2d, Ex. O), Vice President, Sales, Kahrs Int'l Inc., Thomas J. Colgan (Pl.'s Reply to Def.'s X-Mot. SJ 2d, Ex. 1 (Docket #93));

7.      Declaration of Sean Brennan (Docket #15) ("Brennan Decl. 1");

8.      Second Declaration of Sean Brennan (Docket #59) ("Brennan Decl. 2");

9.      Declaration of Sean Brennan 2d Cause of Action (Docket #57) ("Brennan 2d COA Decl.");

10.      Declaration of Meghan E. McBurney, Customs Broker for Kahrs (Docket #15) ("McBurney Decl.");

11.      Declaration of Laurel Duvall (Def.'s X-Mot. SJ, Ex. D) (Docket #68) ("Duvall Decl.");

12.      Declaration of Thomas J. Colgan (Docket #81) ("Colgan Decl. 1");

13.      Second Declaration of Thomas J. Colgan (Docket #81) ("Colgan Decl. 2");

14.      Declaration of Paul Garretto (Def.'s X-Mot. SJ, Ex. E) ("Garretto Decl.") (Docket #68);

15.      CBP ITRAC Report (Pl.'s Mot. SJ, Ex. 12) (Docket #60) (CD-ROM);

16.      Kahrs Int'l, Inc., 2005-2006 Guide Specifications (Def.'s X-Mot. SJ, Ex. I);

17.      Kahrs Int'l, Inc., Technical Manual 3d (Def.'s X-Mot. SJ, Ex. J);

18.      Def.'s Response to Pl.'s Interrogatories, etc. (Def.'s X-Mot. SJ, Ex. K-1) (Docket #71);

19.      Def.'s Amd./Suppl. Response to Pl.'s Interrogatories, etc. (Def.'s X-Mot. SJ, Ex. K-2 (Docket #72));

20.      Def.'s Resp. to Pl.'s Req. for Admissions, Interrog., and for Production of Docs. Pertaining to 2d Cause of Action, Ex. S, Def.'s X-Mot SJ;

21.      Letter from Sean Brennan to Don Dorsett, CBP Import Specialist, dated Sept. 1, 2006, and Letter from Sean Brennan to Laurel Duvall, dated Sept. 1, 2006 (Def.'s X-Mot. SJ, Ex. N).

#102).)

2.      Kahrs, is the owner and importer of record of the merchandise involved in this action and is the party which caused the protest herein to be filed; therefore, pursuant to 28 U.S.C. § 2631(a), Kahrs has standing to bring this action.  (UF ¶2.)

3.      Kahrs made the following entries through the Port of Los Angeles/Long Beach and subsequent CF-29s were issued by CBP:

| Entry Number | Entry Date | CF-29 Issue Date |
| --- | --- | --- |
| 399-0808699-2 | 2/24/06 | 8/16/06 |
| 701-5216140-5 | 9/14/06 | 10/3/06 |
| 701-5216149-6 | 9/20/06 | 10/11/06 |
| 701-5216163-7 | 9/20/06 | 10/11/06 |
| 399-0411896-3 | 9/26/06 | 10/17/06 |
| 399-0807626-6 | 11/05/05 | 11/27/06 |

(UF ¶¶3, 6.[18])

4.      Kahrs entered all of the merchandise it imported in the entries identified in paragraph 3, above, under Heading 4418, subheading 4418.30.00 HTSUS, a duty-free provision for "assembled parquet panels."  (UF ¶4.)

5.      The imported subject merchandise is identified on the entry summaries (CF-7501) for all six entries as "PARQUET PANELS BUILDERS' JOINE[RY]."  *See* CF-

---

[18]*Sic.*  The Parties' Uncontested Facts are mis-numbered and skips paragraph number 5.

7501, Entry Papers, USCIT Court File (Ct. No. 07-000343).

6.      The imported subject merchandise is identified on the commercial invoices  as either "Parquet flooring" or "LINEAL FLOOR[ING]." *See* Commercial Invoices, Entry Papers, USCIT Court File.

7.      The commercial invoices also describe other aspects of the imported subject merchandise including product thickness, type of wood on the face ply, finish, number of wood strips, length, quantity, unit value and total value.  For example, the invoice for Entry #399-0807626-6 describes one article of merchandise as "LINNEA[L] REDOAK STYLE 3-STRIP; Glazed Woodloc."  *See* Commercial Invoice for Entry #399-0807626-6, Entry Papers, USCIT Court File.

8.      On August 16, 2006, Customs issued a CF-29 to Kahrs for Entry Number 399-0808699-2 proposing to rate advance the imported "Lineal Floor, plyw - Mat Satin, entered under 4418.30.0000/free" to subheading 4412.14.3170, HTSUS, at an 8% duty rate because the "product is not parquet panels by tariff standards, but is specifically engineered flooring (flooring of plywood construction), with a nonconiferous face ply and no ply exceeding 6mm in thickness."  Pl.'s Mot. SJ, Ex. 3, Brennan Decl. 1.  The CF-29 also stated to Kahrs that it should "classify future shipments of this merchandise accordingly."  *See* Ex. 3, Brennan Decl. 1.

9.      Kahrs responded to CBP's August 16, 2006 CF-29, by letter dated

September 1, 2006, explaining that it "disagree[d]" with CBP's classification change and noted that it "will continue to classify these products under 4418.30.0000." Def.'s X-Mot. SJ, Ex. N.

10.     Customs issued additional CF-29s to Kahrs on October 3, 2006, October 11, 2006, October 17, 2006, and November 27, 2006 in connection with the remaining five entries at issue in this action (Entry Nos. 701-5216140-5, 701-5216163-7, 701-5216149-6, 399-0411896-3, 399-0807626-6).  Brennan Decl. 1, Exs. 4-8.  The CF-29s for all six entries indicated that they were liquidated by Customs under Heading 4412, in either subheading 4412.14.3170, 4412.22.3170, 4412.29.3620, or 4412.29.3670, HTSUS, at the duty rate of 8%, *ad valorem*, on or between October 27, 2006 and February 16, 2007.  (UF ¶7.)

11.     On October 31, 1997, Customs denied two protests of Kahrs and announced its intention to liquidate their engineered wood flooring products under subheading 4418.30.00 HTSUS.  *See* Protest No. 1001 97-105319, Brennan Decl. 1, Ex 1A; Protest No. 1001 97-105320, Brennan Decl. 1, Ex. 1B; Brennan Decl. 1, ¶¶12 & 18.

12.     Protest No. 2704-07-101011 was timely filed within 180 days of the liquidation of the six entries in this suit that were made through the Port of Los Angeles/Long Beach.  (UF ¶8.)

13.     On August 15, 2007, Customs denied Protest No. 2704-07-101011 pursuant

to 19 U.S.C. § 1515(a).  (UF ¶9.)

14.     This action, filed September 12, 2007,  was timely commenced within 180 days of the date of denial of the protest which is the subject of this action.  (UF ¶10.)

15.     All duties, charges and exactions assessed at liquidation pertaining to the protested entries referred to herein were paid prior to the commencement of this action. (UF ¶11.)

16.     This Court has jurisdiction over the First, Second, Third, Fourth and Sixth Causes of Action in the complaint pursuant to 28 U.S.C. §1581(a).  (UF ¶12.)

*The Imported Subject Merchandise*

17.     Kahrs describes the imported subject merchandise as "Engineered Wood Strip Flooring."  *See* Kahrs Int'l, Inc., Technical Manual 3d (Def.'s X-Mot. SJ, Ex. J).

18.     Kahrs also describes the imported subject merchandise as "engineered wood flooring panels."  *See* Summons, Attach. 1.

19.     "Engineered wood flooring" panels are composed of multiple laminated layers of varying thicknesses, with the grain of each layer running perpendicular to that of the contiguous layer.  Engineered wood flooring panels are "imported in . . . strips or planks (*i.e.,* rectangular panels) with a face ply of, generally, a hardwood species."  The face ply may be constructed of single or multiple strips of wood veneers simulating a "strip" or "plank" flooring.  Duvall Decl. ¶42; *see also* Kahrs Int'l, Inc., Technical Manual

3d (Def.'s X-Mot. SJ, Ex. J); Kahrs Int'l, Inc., 2005-2006 Guide Specifications (Def.'s X-Mot. SJ, Ex. I).

20.    There are three categories of engineered wood flooring at issue in this case:

> (a.)  1-strip engineered wood flooring panels that are 14 millimeters ("mm") thick;
> (b.)  2-strip engineered wood flooring panels flooring that are 15 mm thick; and
> (c.)  3-strip engineered wood flooring panels flooring products that are 15 mm thick.  (UF ¶13.)

21.    The 14 mm thick engineered wood flooring panels consist of 7-plies with the face plies made of varying wood species.  These panels are imported in random lengths from 16⅓ inches, 26 inches, 35½ inches, and 52 inches, are approximately 5 inches wide and no ply exceeds 6mm in thickness.  (UF ¶14.)

22.    The imported 15 mm, 2-strip, 3-ply engineered wood flooring panels consist of three layers ("plies") of wood glued and pressed one on the other and disposed so that the grains of successive layers are perpendicular to each other.  The top layer is a 3.6 mm (slightly less than ⅛ of an inch) thick hardwood or tropical wood with the grain running "vertical" along the length of the board.  The middle layer (the "core" ply) consists of pine "fingers" which run horizontally across the board.  This core ply exceeds 6 mm in thickness.  They are 9.4 mm (approximately 6/16 of an inch) thick, with the grain running at right angles to the grain of the top layer.  There is spacing between

the pine fingers, which may be up to 2 mm (approximately 1/14 of an inch). The bottom layer is made from spruce and is 2 mm (approximately 1/14 of an inch) thick, with the grain running "vertical" along the length of the board and the grain is running at right angles to the grain of the middle layer. (UF ¶25.)

23.    The 14 mm and 15 mm engineered wood flooring panels are laminated. (UF ¶16.)

24.    Kahrs' 14 mm and 15 mm engineered wood flooring panels were designed to simulate solid wood strip or plank flooring, are competitive with solid wood strip or plank flooring, and have advantages that solid wood strip or plank flooring does not have. (*See* UF ¶17.)

25.    The Kahrs 14 mm flooring products in the Protest consist of pre-finished multi-layered hardwood or tropical wood planks. There is a top or wear layer of hardwood or tropical wood, a core layer of five layers of poplar wood, and a bottom layer of spruce. The top layer is a single face strip that is assembled on a support of the core and bottom layers that are laminated together with adhesive to form a flooring panel 5 inches wide that simulates a solid wood "plank" when assembled after importation into flooring. During manufacture of the 14mm panels, tongue and groove edges are cut into the core so that other panels can be joined together after importation to form a complete floor covering. *See* Colgan Decl. 1, Encl. B.

26. The 15 mm flooring is imported in lengths of 82½ to 95⅜ inches and the majority are approximately 8 inches wide. *See* UF ¶15; Colgan Depo. Tr. 27:22-25.

27. The face of the 15 mm flooring product is constructed of two or three narrow strips of wood measuring 4 inches wide for the 2-strip and 2⅝ inches wide for the 3-strip, 3.6 mm thick and 8 inches, 10½ inches or 13 inches in length to simulate solid wood "strip" flooring at the time of importation, and when subsequently assembled into finished flooring. *See* Representative Samples; Colgan Decl. 1, ¶¶16, 35, 50; Colgan Decl. 2, ¶11; Colgan Depo. Tr. 80:18-25–81:1-6.

28. During the manufacture of the 15 mm panels, the patented "Woodloc" interlocking system is cut into the core so that other panels can be joined together after importation to form a complete floor covering. *See* Colgan Decl. 1, Encl. B.

29. All of the imported 14 mm and 15 mm three-strip engineered wood flooring panels consist of an odd number of veneers of wood disposed so that the grains of successive layers are at a right angle to layers above and below. The veneers of wood are glued and pressed one on the other and, thereby, bonded together using adhesive and pressure. *See* Colgan Decl. 1, Encl. B, at 5-6.

*Classification History of Kahrs'*
*Engineered Wood Flooring Products*

30. In November 1997, the World Customs Organization amended the Explanatory Notes to both headings 4412 and 4418 to clarify that panels with a face ply

composed of multiple parallel strips are properly classifiable as "plywood" and not as "parquet panels." *See* Explanatory Notes to Headings 4412 and 4418, as amended; Annex IJ/14 to Doc. 41.600 E (HSC/20/Nov. 97).

31.     Prior to May 30, 2001, Customs classified engineered wood flooring in Heading 4418 when the panel had a face ply consisting of multiple veneer strips of wood.  (UF ¶18.)

32.     Prior to May 30, 2001, Customs classified engineered wood flooring with a face veneer consisting of a single strip of wood in Heading 4412.  (UF ¶19.)

33.     In light of the clarifying amendments to the Explanatory Notes, Customs changed its position and concluded that engineered wood flooring, whether of multiple veneer strips or a single veneer strip, are properly classified in Heading 4412.  (UF ¶20.)

34.     As required by 19 U.S.C. § 1625(c), Customs published notice of its proposal to revoke HQ 962031[19] and three other rulings (NY 806603, NY 806462, and NY 832721) and its treatment of engineered wood flooring in the Customs Bulletin on December 20, 2000.  This notice provided a full copy of each of the relevant rulings which Customs proposed to revoke or modify and a ruling providing its current position.  (UF ¶21.)

---

[19]CBP's HQ 962031 provided that strip flooring, similar to the Kahrs' subject merchandise here, may be classified under heading 4418 HTSUS as "parquet panels" and not under heading 4412 HTSUS as "plywood."  *Id.* at 2.

35.     Customs revoked its prior rulings and treatment which found that engineered wood flooring is classifiable as "[p]arquet panels." *See Notice of Revocation and Modification of Ruling Letters and Treatment Relating to Tariff Classification of Laminated Flooring*, 35 Cust. Bull. 22 (May 30, 2001) ("Revocation Ruling").  (UF ¶22.)

36.     The classification position set forth in the Revocation Ruling became effective 60 days after the date of its publication, *i.e.*, on July 29, 2001.  (UF ¶23.)

37.     Between July 29, 2001 and August 16, 2006, Kahrs made 1867 entries of engineered wood flooring panels at 28 ports that were liquidated as entered under subheading 4418.30.00, HTSUS or under Heading 4409, HTSUS.  (UF ¶24; Duval Decl., ¶28.)

38.     Customs did not advise Kahrs that its entered classifications of any of the engineered wood flooring panels it imported during the period 2001 to 2006 were correct.  *See* Brennan Depo. Tr. 128:5–129:3.

39.     Of the 1867 entries which were liquidated under subheading 4418.30.00 during the period between July 29, 2001 and August 16, 2006, 1776 entries (approximately 95%) were "paperless" and 91 entries were paper (approximately 5%).  *See* Duvall Decl., ¶29.

40.     Of the 1776 "paperless" entries liquidated during the period between July 29, 2001 and August 16, 2006, six entries (approximately 0.3% of the total number of

entries) were filed as paperless "informal," 933 (approximately 50% of the total number of entries) were filed as paperless electronic invoice entries, and 837 (approximately 45% of the total number of entries) were filed as paperless bypass entries. Duvall Decl., ¶30.

41. "Bypass" means that an entry is not reviewed by an import specialist (the review of the entry is bypassed) and the entry is liquidated "as entered," *i.e.*, with no change to the entry data originally submitted to Customs. Duvall Decl., ¶31.

42. Of the 933 paperless electronic invoice entries liquidated during the period between July 29, 2001 and August 16, 2006, 236 (approximately 25% of the total number of the paperless electronic invoice entries) were filed with electronic invoice data. Duvall Decl., ¶32.

43. No paper copy of an entry summary (CF-7501) was filed with Customs for any of the paperless entries liquidated during the period between July 29, 2001 and August 16, 2006, and with the exception of Entry No. 399-0800233-8, none of the paperless entries were reviewed by an import specialist. Duvall Decl., ¶33.

44. Where paper entries were made, 73 of the 91 paper entries (approximately 4% of the total number of entries) liquidated during the period between July 29, 2001 and August 16, 2006 were filed as "paper bypass," which means that the entries were liquidated automatically without review by an import specialist. Duvall Decl., ¶34.

45. Eighteen of the 91 paper entries (less than 1% of the total number of

entries) liquidated during the period between July 29, 2001 and August 16, 2006 were filed as paper for import specialist review; however, 11 of the 18 entries were "manually bypassed," which means that the entries were liquidated without review by an import specialist. Duvall Decl., ¶35.

46. The paper entry summaries for Entry Nos. 399-0800233-8, 201-3042459-9, F23-0114325-1, F23-0114725-2, F23-1145004-3, F23-0115067-8, and F23-0115182-5, which represent less than 0.4% of the total number of entries made by Kahrs from July 29, 2001 and liquidated before August 16, 2006, were reviewed by an import specialist. Duvall Decl., ¶36.

47. With the exception of the entries identified in ¶46, above, no import specialist reviewed an entry summary for any of the entries made by Kahrs on or after July 29, 2001 and liquidated before August 16, 2006. Duvall Decl., ¶37.

48. No import specialist requested a sample or additional information, or effected a change liquidation for any of Kahrs' entries made on or after July 29, 2001 and liquidated before August 16, 2006. Duvall Decl., ¶¶37, 39.

49. With the exception of the entries identified in ¶46, above, all of the Kahrs' entries liquidated without a confirmed review by an import specialist. *See* Duvall Decl., ¶39.

50. Customs selects entries for intensive cargo examinations for a variety of

purposes including national security, in order to ensure that prohibited goods do not enter into the territory of the United States. *See* Ex. S, Def.'s Resp. to Pl.'s Req. for Admissions, Interrog., and for Production of Docs. Pertaining to 2d Cause of Action, ¶13(c).

51.     Cargo examinations may also be conducted to validate the information provided with the entry, including, country of origin marking, other marking issues, classification to the six-digit international tariff level, quantity verification and documentation review. *See id.*

52.     Because of the security devices or techniques employed, cargo examinations are not public events and Customs' records of these examinations are not made on the entry documents or otherwise reported to an importer. *See generally* Swanson Depo. Tr.

53.     Kahrs admits that, aside from the CF-29s at issue in this case, all communications regarding the status of its entries during importation came from its freight forwarder and/or customs broker, and not directly from Customs. *See* Brennan Depo. Tr. 160-165.

54.     The only record in this case containing information regarding the results of the cargo examinations is contained in the CBP Importer Trade Activity ("ITRAC") Report for Kahrs, which contains data that was initially recorded in the ACS database.

*See* ITRAC Report; Duval Depo. Tr. 19; *see generally* Swanson Depo. Tr.

55. The ITRAC report was provided to Kahrs in response to its Freedom of Information Act request in November 2006, several years after the cargo examinations of Entry Nos. 399-0801291-5, 399-0802301-1 and 399-0803895-1 and after the entries at issue in this action were made. (UF ¶26.)

56. Customs conducted cargo examinations and certain information was recorded by CBP personnel in CBP databases and produced in the ITRAC Report regarding the following entries:

| Entry Number | Entry Date | Port of Entry/Cargo Exam Site | Import Specialist Comments | Remarks |
|---|---|---|---|---|
| 701-5112456-0 | 7/2/02 | San Francisco, CA | OK COMPLIANT | INV.591662,INVAL:72476,ISNI,PARQUET FLOORING(SC:MS) |
| 399-0801291-5 | 9/3/03 | San Francisco, CA | OK COMPLIANT | INV:629915,INVAL:60223, C/O SWEDEN, LINNEA CHERRY LIFE 3-STRIP. OAK GRANDA WOOD. XND. |
| 399-0803895-1 | 9/22/04 | Newark, NJ | 203 MB 12/15/04 - EXAM PERFORMED NO DISCREPANCIES FOUND | <> :1:PG:INV#036576,INVAL$31738 ,PANELS,COMPLIANT,ISNI. <> = redacted as per 5 USC 552(b)(2)&(7) |
| 399-0802301-1 | 3/15/04 | Houston, TX | COMPLIANT <> = redacted as per 5 USC 552(b)(2)&(7) | INV#PROFORMA, INVAL$54673,ISNG <> COMMODITY VERIFIED PER INVOICE/EXM INSTRUCTIONS C/O SWEDEN. NO ANOMALIES PRESENT. <> = redacted as per 5 USC 552(b)(2 [*sic*] |

| 399-0808440-1 | 1/31/06 | Chicago, IL | SUMMARY LINE COMPLIANT MARKING CERTIFICATION ACCEPTED | CM,INV#1207741,INVAL:35861, WP:NC,PARQUET PANELS,NLM CF 4647 ISSUED,<>-NG-SE,<>EQUIP,ET,I129 <> = redacted as per 5 USC 552(b)(2)&(7) |

*See* Entry Summary Review Table and Cargo Exams Table, ITRAC Report.

57. Kahrs admitts to having no knowledge of either Customs' procedures or personnel involved with its or any cargo examinations. *See* Brennan Depo. Tr. 155-166.

58. The cargo examinations of Entry Nos. 399-0803895-1 (Sept. 2004), 399-0802301-1 (March 2004) and 399-0808440-1 (Jan. 2006) were conducted by CBP after the entry of judgment by the U.S. Court of Appeals for the Federal Circuit in *Boen Hardwood Flooring, Inc. v. United States,* 357 F.3d 1262 (Fed. Cir. Feb. 2, 2004). *See* ITRAC Report.

59. The cargo examination of Entry No 399-0808440-1 was a random examination (not based on suspicion of an illegal activity) where both a security and trade exam were conducted. Swanson Depo Tr. 74:12–78:13; *see also* ITRAC Report.

60. As a result of a trade exam, CBP determined that Entry No 399-0808440-1 was noncompliant for country-of-origin marking purposes. *See* ITRAC Report; Swanson Depo Tr. 78:16–79:4.

61. The following entry, which was claimed by Kahrs to be one of the "six intensive examinations," was not the subject of a Customs cargo examination; however, the entry summary form (CF-7501) associated with the entry was reviewed by an

import specialist:

| Entry Number | Entry Date | Port of Entry/Cargo Exam Site | Import Specialist Comments | Remarks |
|---|---|---|---|---|
| 201-3042459-9 | 7/16/03 | JFK Int'l Airport (NY) | 253:PARQUET PANELS:C/O=CH:EV= $7,524: COMPLIANT:MM | None |

*See* ITRAC Report; Swanson Depo. Tr. 137-38; Duvall Decl., ¶36.

62.     The ITRAC Report contains no record that an import specialist requested or examined a sample of the merchandise covered by Entry No. 201-3042459-9.  *See* ITRAC Report.

63.     The ITRAC Report contains no record that an import specialist was involved in the cargo examination of Entry No. 399-0801291-5.  Comments were entered by unknown personnel in the data field "Import Specialist Comments" as reported within the ITRAC Report.  *See* ITRAC Report.

64.     The acronyms "ISNI" and "ISNG" are contained in the remarks column corresponding to Entry Nos. 701-5112456-0, 399-0802301-1 and 399-0803895-1, which were the subject of Customs cargo examinations as provided on the ITRAC Report.  *See* ITRAC Report.

65.     "ISNI" means "Import Specialist Not Involved."  "ISNG" means "Import Specialist Not Involved Due to Geography."  *See* Swanson Depo. Tr. 105-107, 126;

Duvall Decl., ¶41.

66.     No import specialist participated in the cargo examinations of Entry Nos. 701-5112456-0, 399-0802301-1 and 399-0803895-1. *See* ITRAC Report; Swanson Depo. Tr. 105-107, 126; Duvall Decl., ¶41; Ex. K1, Def.'s Resp. to Pl.'s Interrog., served on June 27, 2008.

67.     The only information Kahrs received regarding the five cargo examinations was from its broker or freight forwarder. *See* Brennan Depo. Tr. 148, 151-152, 161-162.

### *USCIT Suspended Cases*

68.     Kahrs filed nine summonses during the period from September 27, 1996 through February 10, 2000. *See* Court's Case Management/Electronic Case Files ("CM/ECF") System, CIT DOCKET FOR CASE #: 1:96-cv-02282-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:97-cv-00948-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:97-cv-00949-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:97-cv-01215-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:97-cv-02019-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:98-cv-00946-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:99-cv-00224-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:99-cv-00292-DCP; CM/ECF, CIT DOCKET FOR CASE #: 1:00-cv-00075-DCP.

69.     The consent motion for test case designation and suspension identifies the

merchandise as consisting of "laminated hardwood flooring." *See id.*

70.     The nine civil actions set forth in ¶¶68-69, above, were suspended under *Boen Hardwood*, which was designated as a test case. *See id.*

71.     In those nine civil actions (¶¶68-69, above), Kahrs was represented by the same counsel (John J. Galvin, Esq., Galvin & Mlawski, New York, NY) that represented the plaintiff-appellee in *Boen Hardwood* and, subsequent to the decision in *Boen Hardwood*, each of those nine actions was voluntarily dismissed or dismissed by stipulation of the parties. *See id* and *Boen Hardwood, 357 F.3d at 1263.*

**C.      Summary Judgment—Third, Fourth, & Sixth Causes of Action**

Before the Court is the Government's motion for summary judgment regarding Plaintiff's Third, Fourth, and Sixth Causes of Action.  The issue common to all is the correct tariff classification of Plaintiff's imported engineered wood flooring panels.[20]

Customs refused to classify the subject merchandise as assembled parquet panels under HTSUS heading 4418, treating it as plywood under heading 4412.  Kahrs

---

[20]The Court, in classification cases, has an independent obligation to ascertain the proper classification of merchandise in dispute.  *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984); *Simon Mktg., Inc. v. United States*, 29 CIT __, __, 395 F. Supp. 2d 1280, 1286 (2005).  "[T]he Court must determine 'whether the government's classification is correct, both independently and in comparison with the [broker's] alternative.'" *Cargill, Inc. v. United States*, 28 CIT 401, 408, 318 F. Supp. 2d 1279, 1287 (2004) (*quoting Jarvis Clark*, 733 F.2d. at 878).

challenges[21] the classification on the grounds that the merchandise, as imported, are

"assembled parquet panel[]" flooring and should therefore be classified under heading

4418.  (Pl.'s Mem. in Opp. to Def.'s X-Mot. for SJ ("Pl.'s Opp. Br.") 18.)  In the

alternative, Kahrs contends that the engineered wood flooring constitutes "Edged-glued

lumber" classifiable as "Other" under subheading 4418.90.4590.  (Pl.'s Opp. Br. 28-29.)

Finally, in yet another alternative, Kahrs argues that the imported merchandise is

classifiable as "builders' joinery" under subheading 4418.90.4590 because "the provision

for builders' joinery is clearly narrower and includes a smaller number of products than

the provision for plywood, which involves multiple applications."  (Pl.'s Opp. Br. 29-

30.)

Classification consists of a two-step analysis—first, construing the relevant tariff

headings, then second, determining under which of those headings the merchandise at

issue is properly classified. *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed.

---

[21]Kahrs also claimed in Count 1 of its Complaint that Customs' classification and liquidation of the entries under heading 4412 "modified or revoked prior interpretive classification rulings or decisions which had been in effect for at least 60 days and/or modified the classification treatment previously accorded Kahrs by CBP to substantially identical transactions without first publishing notice in the customs Bulletin as specified in 19 U.S.C. § 1625(c)."  (Compl. p. 2; ¶¶ 1-29.)  In Count 2, Kahrs alleges that there "existed an 'established and uniform practice'. . . of classifying the [merchandise] under 4418.30.0000" and Customs' failure to comply with the notice and comment provisions of 19 U.S.C. § 1315(d) was a violation of its rights.  (*Id.* at 2.)  The Court will take up these issues in its analysis *infra*.

Cir. 1998) (*citing Universal Elecs., Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997)). Determining the proper meaning of the relevant tariff headings is a question of law, while application of the terms to the particular merchandise is a question of fact. *Id.*

When construing tariff terms, the Court may look to common and commercial meanings if such construction would not contravene legislative intent. *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000). To ascertain the common meaning of a tariff term, the Court may refer to dictionaries, scientific authorities, and similarly reliable resources. *Mead Corp. v. United States*, 283 F.3d 1342, 1346 (Fed. Cir. 2002).

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "A classification analysis begins, as it must, with the language of the headings." *Id.* at 1440.

In pertinent part, the HTSUS General Rule of Interpretation ("GRI") 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS (2000). In fact, "Section and Chapter Notes are not optional interpretive rules, but are statutory law, codified at 19 U.S.C. § 1202." *Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 926 (Fed. Cir. 2003) (*citing Libas, Ltd. v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999)). The GRIs are applied in

numerical order. *See ABB, Inc. v. United States*, 421 F.3d 1274, 1276 n.4 (Fed. Cir. 2005)

(*citing Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).

To apply GRI 1, the Court must construe "the language of the heading, and any

section or chapter notes in question, to determine whether the product at issue is

classifiable under the heading." *Orlando Food*, 140 F.3d at 1440. The Court must

identify the proper heading or headings in which an article is classifiable before it can

determine the subheading that provides the classification for the item. *Id.* Accordingly,

in this case, the Court must consider whether the subject merchandise is classifiable

under HTSUS heading 4412 or 4418.

1. Third Cause of Action—The Subject Merchandise is Classifiable
   Under Heading 4412 and Not Classifiable Under Heading 4418

Customs liquidated the entries of engineered wood flooring panels as follows:

| Entry No. | CBP Classification Subheading |
|---|---|
| 701-52161405 | 4412.29.3670 |
| 701-52161637 | 4412.29.3670 |
| 701-52161496 | 4412.29.3670 |
| 399-04118963 | 4412.29.3670 |
| 399-08076266 | 4412.29.3670 |
| 399-08086992 | 4412.14.3170 |

Subheading 4412.29[22] HTSUS is the appropriate classification for "[p]lywood, veneered

panels and similar laminated wood," made of plies that *exceed* 6 mm, and has "at least

one outer ply of nonconiferous wood." 4412.29 HTSUS. Whereas subheading 4412.14[23]

HTSUS is the appropriate classification for "[p]lywood, veneered panels and similar

---

[22]The relevant portion of the HTSUS Chapter 44 reads as follows:

| | |
|---|---|
| 4412 | Plywood, veneered panels and similar laminated wood: |
| | Plywood consisting solely of sheets of wood, each ply not exceeding 6 mm in thickness: |
| . . . | |
| | Other, with at least one outer ply of nonconiferous wood: |
| 4412.29 | Other: |
| | Plywood: |
| | Not surface covered, or surface covered with a clear or transparent material which does not obscure the grain, texture or markings of the face ply: |
| 4412.29.15 | With a face ply of birch (Betula spp.) |
| . . . | |
| 4412.29.36 | Other |

[23]The relevant portion of the HTSUS Chapter 44 reads as follows:

| | |
|---|---|
| 4412 | Plywood, veneered panels and similar laminated wood: |
| | Plywood consisting solely of sheets of wood, each ply not exceeding 6 mm in thickness: |
| . . . | [With at least one outer ply of Tropical Wood] |
| 4412.14 | Other, with at least one outer ply of nonconiferous wood: |
| | Not surface covered, or surface covered with a clear or transparent material which does not obscure the grain, texture or markings of the face ply: |
| 4412.14.05 | With a face ply of birch (Betula spp.) |
| . . . | |
| 4412.14.31 | Other |
| . . . | [Other:] |
| 4412.14.3160 | Not surface covered |

laminated wood," "consisting solely of sheets of wood, each ply *not exceeding* 6 mm in thickness," and that has "at least one outer ply of nonconiferous wood." 4412.14 HTSUS (emphasis added.) The plain language of the HTSUS differentiates the various types of plywood as between "[p]lywood consisting solely of sheets of wood, each ply not exceeding 6 mm in thickness" and "[o]ther, with at least one outer ply of nonconiferous wood." *Compare* 4412.13–4412.19 HTSUS *with* 4412.22–4412.92, HTSUS. The terms "plywood," "veneered," and "laminated" are not defined by the tariff heading and so the Court resorts to their common definitions.

"Plywood" is "a structural material consisting of sheets of wood glued or cemented together with the grains of adjacent layers arranged at right angles or at a wide angle and being made up (1) wholly of uniformly thin veneer sheets [all-veneer plywood] or (2) of usually equal numbers of veneer sheets on either side of a thicker central layer [lumber-core plywood]." WEBSTER'S THIRD NEW INT'L DICTIONARY 1746 (1986).

"Veneer" is "a thin sheet of wood cut or sawed from a log and adapted for adherence to a smooth surface . . . as (1): a layer of wood of superior value or excellent grain for overlaying an inferior wood . . . usually by gluing." *Id.* at 2540.

"Laminate" is "to make by uniting superposed layers of one or more materials . . . as by means of an adhesive . . . ." *Id.* at 1267.

The Explanatory Notes for heading 4412 provides that plywood "is usually formed of an odd number of plies." World Customs Organization, *Harmonized Commodity Description & Coding System Explanatory Notes,* Explanatory Note 44.12, 814-16 (3d ed. 2002) ("Explanatory Note(s)").[24] Moreover, the Explanatory Note details that heading 4412 "covers plywood panels or veneered panels, used as flooring panels, and sometimes referred to as 'parquet flooring.' These panels have a thin veneer of wood affixed to the surface, so as to simulate a flooring panel made up of parquet strips." Explanatory Note 44.12 at 815.

The Parties agree that the 14 mm and 15 mm engineered wood flooring panels are "laminated" and have certain physical dimensions and characteristics. *See* Undisputed Material Facts, II.B., *supra*, ¶¶ 17-29. The National Wood Flooring Association ("NWFA"), a trade association, defines "engineered flooring" as a "flooring product [that] consists of layers of wood pressed together, with the grains running in different directions. It is available in 3 and 5 ply." *See* www.woodfloors.org/consumer/whyTypesStyles.aspx (*last visited* Sept. 11, 2009.)

Having examined the Representative Samples submitted by the Parties, *see* Def.'s X-Mot. SJ, Ex. H and Pl.'s Mem. In Opp, to Def.'s X-Mot. SJ, Enclosures E-1, E-2, and E-3

---

[24]The Court may consult the explanatory notes for guidance in classifying merchandise. *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006) (noting that explanatory notes are "instructive, but not binding").

(Docket #82), the Court finds that the manufacture and characteristics of the 15 mm, 2-strip engineered wood flooring panels and the 15 mm, 3-strip engineered wood flooring panels are described by the terms of subheading 4412.29 HTSUS, and are properly classified under that subheading. *See Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262 (Fed. Cir. 2004) (finding substantially similar engineered wood flooring panels properly classifiable as "plywood" under heading 4412 HTSUS); *see also* Undisputed Material Facts, II.B., *supra*, ¶¶17-29. The Court also finds that the 14 mm, 1-strip engineered wood flooring panels conform with the defined terms of subheading 4412.29 HTSUS and are properly classified under that subheading. *See Boen Hardwood,* 357 F.3d at 1262; Undisputed Facts, II.B., *supra*, ¶¶21, 23-25. The Court's analysis does not stop here, however, because Plaintiff alternatively suggests that the subject merchandise is also described by the terms of heading 4418. *See* GRI 3(a) (Requiring that—where merchandise is prima facie classifiable under two or more headings—"[t]he heading which provides the most specific description shall be preferred to headings providing a more general description.").

Kahrs asserts that its engineered wood flooring products at issue here are classified under heading 4418 HTSUS as "parquet panels" for several reasons. First, according to Kahrs, the "*Explanatory Note* definition to subheading 4418.30 applies to the ... engineered hardwood flooring." (Pl.'s Opp. Br. 21.) Second, Kahrs argues that the

imported merchandise conforms to the article description under subheading 4418.30 in that the products are both "assembled" and "parquet panels." (*Id.*) Finally, Kahrs asserts that the imported merchandise is more specifically classified under "assembled parquet panels" (4418.30) than under "plywood" pursuant to the "Rule of Relative Specificity," *i.e.*, GRI 3. (*Id.* at 26.)

Heading 4418[25] covers "[b]uilders' joinery and carpentry of wood, including cellular wood panels and *assembled parquet panels . . . .*" 4418 HTSUS (emphasis added.) The terms "assembled" and "parquet" are not defined in the tariff code and so the Court may resort to the common meaning of these terms.

The term "parquet" is "a patterned flooring; especially: one made of parquetry." WEBSTER'S THIRD NEW INT'L DICTIONARY 1644 (2002). "Parquetry" is "joinery or cabinetwork consisting of an inlay of geometric or other patterns usually of different colors and used especially for furniture and floors." *Id.* The *American Heritage*

---

[25]The relevant portion of the HTSUS Chapter 44 reads as follows:

| 4418 | Builder's joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes: |
|---|---|
| . . . | |
| 4418.30.00 | Parquet panels |
| . . . | |
| 4418.90 | Other: |
| 44.18.90.2000 | Edge-glued lumber |
| 4418.90.45 | Other: |
| . . . | |
| 4418.90.4590 | Other |

*Dictionary* similarly defines "parquetry" as "inlay of wood, often of different colors, that is worked into a geometric pattern or mosaic and is used especially for floors." THE AM. HERITAGE DICTIONARY 1318 (3d ed. 1996). The *Oxford English Dictionary* defines "parquetage" (a variant of the word "parquet") as "flooring, wooden mosaic." XI THE OXFORD ENGLISH DICTIONARY 251 (2d. ed. 1989). Finally, the wood flooring trade defines "parquet flooring" as "a series of wood flooring pieces that create a geometric design." *See* NWFA website *available at* www.woodfloors.org/consumer/whyTypesStyles.aspx (*last visited* Sept. 11, 2009.)

This Court finds that the *sine qua non* of "parquet" or "parquetry" is that the inlaid wood strips of the parquetry themselves form *a geometric pattern or mosaic.* The Parties agree that Kahrs' imported flooring products "were designed to simulate *solid wood strip or plank flooring*, are competitive with solid wood strip or plank flooring, and have advantages that solid wood strip or plank flooring does not have." *See* Undisputed Material Facts, ¶24. It is evident to the Court that, in their imported condition,[26] Kahrs' 14 mm 1-strip, 15 mm 2-strip, and 15 mm 3-strip flooring products do not form a geometric or mosaic pattern. *See* Representative Samples. Therefore, this Court holds that Kahrs' engineered wood flooring panels of the 14 mm 1-strip, 15 mm

---

[26]*See Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) ("It is well settled law that merchandise is classified according to its condition when imported.").

2-strip, and 15 mm 3-strip variety, in their imported condition, are not assembled

parquet panels and consequently are not classifiable under subheading 4418.30 HTSUS.

Plaintiff advances an interesting argument that, as imported, "the face strips on

multi-strip engineered flooring panels [*i.e.,* 15 mm 2-strip and 15 mm 3-strip flooring

products] form a pattern because they simulate the patterns of solid wood plank and

strip flooring." (Pl.'s Opp. Br. 18.) The Court, however, finds this argument

unavailing.[27] The tariff text of heading 4418 HTSUS does not require that the subject

merchandise contain mere patterns or simulations of patterns in its construction, but

that the strips of inlaid wood forming the patterns must be genuine "parquet" (not

simulated)—*i.e.,* wood strips inlaid forming a geometric or mosaic design. In other

words, in order for a particular product to be classified as "parquet panels" under

heading 4418 they must inherently be "parquet" as that term is commonly understood.

The Explanatory Notes, which Kahrs' erroneously invokes to support its own

reasoning, in fact, supports this view instead. Explanatory Note 44.18 provides that

heading 4418 covers "**parquet strips, etc., assembled into panels or tiles,** with or

---

[27]Plaintiff's arguments that hang on the modifier "usually" in that various
dictionary definitions do not *require* "parquet" to be of a geometric design (*e.g.,*
"parquet" is made of "[s]urfaces formed of small pieces of varied colored woods, and
*usually* in geometrical designs") strain credulity. (Pl. Opp. Br. 22 (citation omitted and
emphasis added).) Kahrs' products that simulate the patterns of solid wood plank and
strip flooring could not be confused with true "parquet" flooring.

without borders, including parquet panels or tiles consisting of parquet strips assembled on a support of one or more layers of wood. These panels or tiles may be tongued and grooved at the edges to facilitate assembly." Explanatory Note 44.18 (emphasis in original).

The problem with Kahrs' argument is that its products are not comprised of genuine "parquet strips" in the first instance, but are merely wood strips, made to simulate the patterns of solid wood plank and strip flooring. Moreover, the Explanatory Notes specifically *exclude* "[p]lywood panels or veneered panels, used as flooring panels, which have a thin veneer of wood affixed to the surface, so as to simulate a flooring panel made up of parquet strips." *Id.* Thus even if Plaintiff's products were *simulated* parquet flooring, which they are not, they could not be classified under heading 4418. Therefore, Kahrs' subject merchandise, which simulates the patterns of solid wood plank and strip flooring, are clearly not wood flooring that is "parquet," or "parquetry," and cannot be classified under 4418 HTSUS.

Plaintiff has also alleged that the merchandise constitutes "'parquet panels' because they have a face of multiple veneer strips which are assembled on a support of multiple layers of wood. They are multi-layered pre-finished hardwood parquet flooring panels that form a pattern or geometrical design when installed and fall within the common meaning of 'parquet . . . .'" (Compl. ¶41; *see also* Answer ¶41.) This

argument, too, is unavailing.  As indicated above, "merchandise is classified according

to its condition when imported," *Mita Copystar Am.*, 21 F.3d at 1082, thus even if Kahrs'

subject merchandise arguably could form a "pattern or geometrical design when

installed," this Court need not credit such a contention.  (*See* Compl. ¶41.)

Plaintiff also cites to the Explanatory Notes for subheading 4418.30[28] for the

proposition that, within the criteria of those subheading Explanatory Notes, "parquet"

flooring may consist of a "striped pattern," similar to its subject merchandise,

particularly the 15 mm 2-strip and 3-strip products.  (Pl.'s Opp. Br. 18, 23.)  The Court

agrees with the Government, that such a reading of the tariff code is "strained."  (Def.'s

Reply Mot. Summ. J On First Third, Fourth, and Sixth Causes of Action 3 ("Def.'s SJ

Reply Br.").)  The subject merchandise here is unambiguously described and excluded

from heading 4418 and described and provided for in heading 4412.  *See* Explanatory

Notes 44.12 and 44.18.  As a result, to the extent that Explanatory Notes for subheading

4418.30 are inconsistent with the plain and unambiguous language of subheading

4418.30 HTSUS, this Court will give the contradictory text no weight.  *See Archer Daniels*

---

[28]The Explanatory Notes for subheading 4418.30 states: "For the purposes of classification in this subheading, the term "parquet panels" includes pre-assembled flooring panels made from two or more rows of narrow and generally short pieces of wooden boards (strips) that have been joined edge-to-edge.  The surface of this type of panel may display a striped pattern which may vary according to the grain and color of the individual strips."

*Midland Co. v. United States*, 561 F.3d 1308, 1315 (Fed. Cir. 2009).

Plaintiff also contends that its imported products here are "*assembled* parquet panels" under heading 4418 HTSUS (emphasis added). (Pl.'s Opp. Br. 21; Compl. ¶41.) *Webster's Third New International Dictionary* defines "assemble" as "to bring together: as . . . to fit together various parts of so to make into an operative whole." WEBSTER'S THIRD NEW INT'L DICTIONARY 131 (1986). In a metaphysical sense, Kahrs' subject merchandise may well be individually "assembled" components of a "prefinished" (pre-installation) hardwood floor that would cover an inferior substrate floor in a home or office. *See* Ex. O, Transcript ("Tr.") of Deposition of Sean Brennan ("Brennan"), Kahrs Int'l, Inc., at pp. 140:7–145:10. However, for tariff purposes, since neither the 14 mm 1-strip, nor 15 mm 2-strip, nor 15 mm 3-strip are parquet per se, they cannot be "assembled parquet panels." *See* 4418 HTSUS.

Plaintiff advances one final point and assumes, *arguendo*, that its engineered wood flooring can be classified under both headings 4412 and 4418 and asserts that this Court should resort to the Rule of Relative Specificity (GRI 3(a)) in order to find that heading 4418 more specifically provides the classification of its merchandise. (Pl. Opp. Br. 26-28.) This argument simply lacks merit. As demonstrated above, the subject merchandise is not *prima facie* classifiable under both headings 4418 and 4412, but is classifiable under heading 4412 pursuant to GRI 1. Accordingly, where merchandise is

not *prima facie* classifiable under two or more headings, GRI 3 is inapplicable. *See*

*Orlando,* 140 F.3d at 1440. Moreover, where GRI 1 dictates the appropriate classification

of merchandise, resort to the remaining GRIs would be inappropriate. *See Mita Copystar*

*Am. v. U.S.,* 160 F.3d 710, 713 (Fed. Cir. 1998).

Accordingly, for the foregoing reasons, the Government's motion for summary

judgment as to Plaintiff's Third Cause of Action is GRANTED.

2. <u>Fourth Cause of Action—Imported 15 mm Engineered Wood
Flooring Is Not Classifiable Under 4418 As "Edge-Glued Lumber"</u>

Kahrs advanced a claim in its Fourth Cause of Action that its imported 15 mm

engineered wood flooring (both the 2-strip and 3-strip varieties) is classifiable under

heading 4418 HTSUS, particularly subheading 4418.90.2000 HTSUS as "edge-glued

lumber." (Compl. ¶¶42-47.) The Government moved for summary judgment on this

claim. The Government cited to this court's reversed decision in *Boen Hardwood* as

instructive authority regarding the common commercial terms for "lumber," etc.

(Def.'s Mot. SJ Br. 15-17.) In *Boen Hardwood,* the court found that

> Lumber is defined as "timber sawed into standardized
> structural members, as boards or planks," [708 Webster's II
> New Riverside University Dictionary (1998) (Webster's)]; "a
> wood product manufactured from logs by sawing, resawing
> and, usually, planing, with all four sides sawn. . . [Random
> Lengths Publications, Terms of the Trade 205 (4th Ed. 2000)];
> "logs that have been sawed and prepared for market," [1177
> McGraw-Hill Dictionary of Scientific and Technical Terms
> (Sybil P. Parker ed., 5th ed. 1994)]; "a collective term for wood

> that has been sawed into appropriate sizes for building and other uses," Harcourt Academic Press Dictionary of Science and Technology, available at http://www.harcourt.com/dictionary (Harcourt"); "an American term for converted wood; also for felled trees prepared for the sawmill. Timber split or sawn for use in building." Thomas Corkhill, The Complete Dictionary of Wood, 317 (1979).

*Boen Hardwood Flooring, Inc. v. United States*, 27 CIT 40, 46, n.7 (2003) (original brackets

omitted). The Court of International Trade concluded that this definition

> strongly suggest[s] that the[] terms refer to relatively unprocessed single-layer wood pieces, cut and shaped by the sawmill for use in carpentry and construction, rather than to composite panels. The subject merchandise is distinct from such wood products, as it has been not only sawn and shaped, but layered, laminated, and finished into a final product.

*Id.*

Kahrs claims in its Complaint that the imported 15 mm panels are "edge-glued

lumber." (Compl. ¶45). However, the undisputed evidence demonstrates that, far from

being single layers of wood, cut and shaped by the sawmill and glued only on the

edges, *i.e.,* edge-glued lumber, these articles are layered, laminated and finished into

flooring panels and classified as "plywood" under 4412 HTSUS.

Kahrs proffered no evidence or argument in opposition, but merely "desires to

preserve this claim for any appellate review that may be pursued." (Pl. Opp. Br. 29.)

Therefore, in light of the foregoing analysis, the Government's motion for summary

judgment as to Plaintiff's Fourth Cause of Action is GRANTED.

3.       Sixth Cause of Action—Engineered Wood Flooring is Not Classifiable Under Subheading 4418.90.45 HTSUS As "Builders' Joinery"

Kahrs alleges in its Sixth Cause of Action that the imported subject merchandise is alternatively classifiable under subheading 4418.90.4590 HTSUS as "other," "builders' joinery," which is dutiable at 3.2% *ad valorem*. (Compl. ¶¶63-65.)

Plaintiff relies on this court's decision in *Faus Group, Inc. v. United States* for the proposition that the fiberboard flooring at issue in that case, which was held to be classifiable as "builders' joinery" under subheading 4418.90.45 HTSUS, is analogous to Kahrs' own subject merchandise here. (Pl. Opp. Br. 29-30 (*citing Faus Group, Inc. v. United States*, 358 F. Supp. 2d 1244 (2004).)

Similar to the Court's analysis on Plaintiff's Third Cause of Action, the Explanatory Notes to heading 4418 specifically exclude Kahrs' subject merchandise as "builders' joinery." (Def.'s Mot. SJ Br. 17-18.) Additionally, Plaintiff's reliance on *Faus Group* is misplaced as that case is inapposite. *Faus Group* concerned the classification of fiberboard flooring panels. *Faus Group*, 358 F. Supp.2d at 1258 n.28. Though the court found that the fiberboard was *prima facie* classifiable under heading 4418 as "builders' joinery," it declined to accept Faus Group's argument that its product was classifiable in heading 4418 HTSUS. *Id.* at n.3. Instead, the court held that Faus Group's products were classifiable under the *eo nomine* provision for "fiberboard" under heading 4411. *Id.*

at 1269. The *Faus Group* merchandise is decidedly different from Kahrs' subject

merchandise. Kahrs' products are made of wood and Faus Group's products are made

of fiberboard. "Wood" is not the same as "fiberboard." *Id.* at 1250.

As was discussed by the Court above in its discussion on the Third Cause of

Action, *supra*, Kahrs' subject merchandise is classifiable under heading 4412 as

"plywood" per GRI 1. Accordingly, in light of the foregoing analysis, the Government's

motion for summary judgment as to Plaintiff's Sixth Cause of Action is GRANTED.

**D.      Summary Judgment—First Cause of Action**

The main thrust of Plaintiff's challenge to its denied protest arises under CBP's

alleged violations of 19 U.S.C. § 1625(c). (Compl. ¶¶ 1-29; Pl.'s Mot. SJ 9-26.) Kahrs

contends that in August 2006, CBP impermissibly revoked certain "rulings and

decisions" from 2001 through 2006, which had allowed Kahrs to classify substantially

similar imports of engineered wood flooring panels duty free under 4418.30.00 HTSUS

as "parquet panels." (Compl. ¶¶ 14-18, 25-29.) Customs' revocation of these "prior

rulings and decisions" was unlawful, Kahrs argues, because such action violated the §

1625(c) notice and comment provisions. (*Id.*) Following extensive and protracted

discovery,[29] the Government filed its response to Kahrs' First Cause of Action in the

---

[29]Initially, Plaintiff filed its first motion for summary judgment (Docket #12) on this cause of action very early in this case prior to any formal discovery. The Government requested the opportunity for discovery before responding to Kahrs'

form of a cross-motion for summary judgment. The Government contends that

Plaintiff's arguments on this count is meritless and nothing more than a red herring.

Title 19, section 1625(c) provides that:

> A proposed interpretive ruling or decision which would—
>
> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
>
> (2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
>
> shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

19 U.S.C. § 1625(c).

1. Plaintiff's Contentions

Kahrs essentially argues under § 1625(c)(1) that Customs' denial of its two

---

renewed motion for summary judgment, and by order of this Court, dated May 1, 2008, the request was granted. (Docket #18). Following a period of discovery-related impasse and difficulty between the parties, as well as several filing extensions, the Government was able to respond to Kahrs' motion on March 19, 2009 (Docket #68).

protests from October 1997[30] (which declared that Kahrs' engineered wood flooring was classifiable at that time as "parquet panels") constitute prior decisions or rulings, which were improperly revoked by Customs when it issued the CF-29s starting in August 2006[31] proposing to liquidate the entries of the subject merchandise under heading 4412 HTSUS. *See* Brennan Decl. 1, Exs. 1A & 1B. (Pl.'s Mot. SJ 10-11; Pl.'s Opp. Br. 12-13; Pl.'s Reply to Def.'s Amd. Resp. To Pl.'s Statement of Mat. Facts and Opp. To Pl.'s Mot. For SJ on the First COA ("Pl.'s Reply") 2-5.) Adding an additional layer of confusion to its arguments, Kahrs also contends that certain merchandise examinations by Customs—what Kahrs' calls the "six intensive examinations"—as well as the "hundreds of liquidation decisions" made from 2001 through 2006 on its flooring products under 4418.30.00 HTSUS are also "interpretive rulings or decisions" under § 1625(c)(1). (Pl.'s Mot. SJ 11-13, 15-17; Pl.'s Opp. Br. 1-2, 13-15; Pl.'s Reply 2-5, 7-11.)

Alternatively, Kahrs argues that the "six intensive examinations" of its imported merchandise and the hundreds of liquidations made by Customs from 2001 to 2006 under 4418.30.00 HTSUS established a prior "treatment" under § 1625(c)(2). (Pl.'s Mot. SJ 17-22; Pl.'s Opp. Br. 9-10, 16-18; Pl.'s Reply 5-9.) Thus, according to Plaintiff, when Customs issued the CF-29s starting in August 2006 for the subject merchandise, this

---

[30]*See* Undisputed Material Facts, II.B., *supra,* ¶11 (Protest Nos. 1001 97-105319 and 1001 97-105320).

[31]*See* Undisputed Material Facts ¶3, *supra.*

"decision" effectively revoked the prior treatment accorded to Kahrs' substantially identical transactions.  (*Id.*)

2.      Defendant's Contentions

The Government argues that Kahrs' legal theories in support of its First Cause of Action are meritless.  (Def.'s X-Mot. for SJ 18-30; Def.'s SJ Reply Br. 8-15.)

First, with respect to Kahrs' § 1625(c)(1) challenge, the Government argues that the species of decisions at issue here—the denied protests from 1997, the hundreds of liquidations under 4418.30.00, and the CF-29s—are not the kinds of agency "interpretive ruling or decision" contemplated by the text of § 1625.  (Def.'s X-Mot. for SJ 20-27; Def.'s SJ Reply Br. 9, 11.)  In other words, the Government argues that based upon a close reading of the statute, "only precedential interpretive rulings or precedential protest review decisions" are covered by § 1625.  (Def.'s X-Mot. for SJ 22.)  Therefore, the Government evinces that none of the types of "decisions" advanced by Plaintiff here meet this statutory criteria.  (*Id.*)

Second, the Government advocates that even if the 1997 denied protests could be construed as "interpretive rulings or decisions," Customs had revoked any such prior rulings and treatment that would have derived from that "decision" as of July 29, 2001.  *See* Revocation Ruling; Undisputed Material Facts, II.B., *supra*, ¶¶34-35.  Moreover, the two 1997 denied protests are irrelevant because they "did not involve the issue of

whether the merchandise was properly classifiable in subheading 4418.30.00 and none

of the subheadings of Heading 4412 were implicated in either the protest or its denial."

(Def.'s X-Mot. for SJ 25.)

Finally, the Government argues that the CF-29s themselves do not trigger the

notice and comment provisions of § 1625(c) because the notices of action here were

issued *after* the U.S. Court of Appeals for the Federal Circuit issued its 2004 decision in

*Boen Hardwood Flooring, Inc.*, 357 F.3d 1262, which held that imported engineered wood

flooring was properly classified as "plywood" under heading 4412 HTSUS, and were

consistent with that decision. (*Id.* at 25-26 (*citing Sea-Land Serv., Inc. v. United States*, 239

F.3d 1366 (Fed. Cir. 2001) (finding that the interested public was notified of Customs'

tariff modification by way of the agency's implementation of the court's decision; thus

solicitation of comments under § 1625(c) was not required).) The Government attaches

great weight to the Federal Circuit's decision in *Boen Hardwood* because that case

"involved the classification of virtually identical merchandise to that at issue here." (*Id.*

at 27.) And since Customs has not attempted to modify or limit the *Boen Hardwood*

decision under § 1625(d),[32] the agency was constrained to follow this precedent. (*Id.*)

---

[32]Section 1625(d) provides that "[a] decision that proposes to limit the application of a court decision shall be published in the Customs Bulletin together with notice of opportunity for public comment thereon prior to a final decision." 19 U.S.C. § 1625(d) (2006).

With respect to Kahrs' § 1625(c)(2) challenge, the Government similarly argues that, as with § 1625(c)(1), no proposed interpretive ruling or decision exists here that would trigger the statute's notice and comment provisions. (*Id.*) Additionally, Kahrs has failed to proffer evidence to support its claim that a "treatment" by Customs actually existed. (*Id.*) On this second point, the Government asserts that neither the six cargo examinations ("intensive examinations") conducted by Customs, nor the hundreds of liquidations of Kahrs' merchandise under 4418.30.00, nor any entry summary review conducted by Customs, constitutes the establishment of a prior "treatment" that would obligate the agency to adhere to the protections encompassed by § 1625(c). (*Id.* at 28-30.)

3. Analysis—Plaintiff's Motion For Summary Judgment on the First Cause of Action is Denied.

a. *Section 1625(c)(1)*

The Court now turns to the first element of § 1625(c)(1). Kahrs needs to show that it obtained "a prior interpretive ruling or decision which has been effect for at least 60 days." 19 U.S.C. § 1625(c)(1); *see Int'l Custom Products, Inc.*, 2009 WL 205860, at *5. Section 1625(c) does not define the term "interpretive ruling or decision." However, § 1625(a) does define "interpretive ruling" to "includ[e] any ruling letter, or internal advice memorandum." 19 U.S.C. § 1625(a). This section further includes "protest review decision[s]" as the types of additional determinations that trigger the statute's

publication requirements.[33] *See id.* § 1625(a). The Federal Circuit, in analyzing the plain language of the statute, concluded that the terms of § 1625(c) should read consistently with the terms of § 1625(a). *See California Indus. Prod., Inc. v. United States,* 436 F.3d 1341, 1351 (Fed. Cir. 2006) (*citing Timex V.I., Inc. v. U.S.,* 157 F.3d 879, 884 (Fed. Cir. 1998) ("It is well-settled that words appearing in a statute should be read consistently: a particular word appearing multiple times in a statutory provision should be given the same reading, unless there is a clear Congressional intent to the contrary."). The *California Industrial Products* court therefore held that "'decision' in the phrase 'ruling or decision' . . . includes a 'protest review decision.'" *Id.*

Customs promulgated regulations that define "interpretive rulings" to "include[] an internal advice decision . . . or a holding or principle covered by a protest review decision." 19 C.F.R. § 177.12(a) (2006). The regulations further provide that a "ruling" is a written statement that interprets and applies the provisions of the Customs' laws to a specific set of facts. *See* 19 C.F.R. § 177.1(d)(1). Finally, an "internal advice memorandum" is defined as "[a]dvice or guidance as to the interpretation or proper application of the Customs and related laws . . . . regarding a specific Customs transaction . . . [that] is either prospective, current, or completed. 19 C.F.R. § 177.11(a).

---

[33]A "protest review decision" is a decision by Customs that follows from an second review of decided protest, akin to a reconsideration decision. *See* 19 C.F.R. § 174.27 (2006); 12 Cust. Bull. 1109 (1978).

The Government argues that, based on *California Industrial Products,* § 1625(c) "covers *only* 'interpretive rulings' and 'protest review decisions.'" (Def.'s X-Mot. for SJ 21.)  However, as was rejected by this Court in another case, this reading is too restrictive and not supported by the statutory text.  *See International Custom Products, Inc. v. U.S.,* 32 CIT __, __, 549 F. Supp.2d 1384, 1393 (2008).  In fact, the Federal Circuit clearly notes that "'decision' in the phrase 'ruling or decision' . . . *includes* a 'protest review decision.'" *California Indus. Prod., Inc.,* 436 F.3d at 1351 (emphasis added).  Thus, based on Congress' use of the word "includes" in the statutory language of § 1625(c), a "protest review decision" is to be included among the larger category of otherwise generic Customs' "decision[s]." *See International Custom Products, Inc.,* 549 F. Supp.2d at 1393.  Accordingly, this Court finds for purposes of deciding this case, the text of § 1625 covers interpretive rulings, ruling letters, internal advice memoranda, protest review decisions, or decisions that are the functional equivalent of interpretive rulings or decisions.  *Id.;* § 1625(c); § 177.12.

Addressing the first part of Kahrs' argument, that the two 1997 denied protests constitute prior decisions or rulings, this Court agrees with the Government, and holds that the 1997 denied protest decisions plainly do not fall within the ambit of the covered rulings or decisions of § 1625.  Kahrs' 1997 denied protest decisions simply stated in Box 17, on Customs Form 19, that the protest was "Denied in full" because the

"[m]erchandise is precluded from the requested provision [either 4409.20.25, 4409.20.90, or 4418.90.20 HTSUS/duty free] by definition and chapter notes." *See* Protest Nos. 1001 97-105319 and 1001 97-105320, Brennan Decl. 1, Exs 1A & 1B. While arguably, these determinations could be construed as "rulings," the denied protests here merely exclude the subject merchandise from certain tariff provisions and do not require that they be classified henceforth under a particular tariff heading. (*Id.*) That is, there is no directive set out by these denied protests that require Kahrs classify its merchandise under 4418.30.00 HTSUS.

Similarly, Kahrs' contention that the "six intensive examinations" and the "hundreds of liquidation decisions" made from 2001 through 2006 also constitute "interpretive rulings or decisions" are belied by the plain language of the statute. Neither the results of Customs cargo examinations (intensive or otherwise) nor the mere liquidation of merchandise at the declared bypass rate are "interpretive" rulings or decisions under § 1625(c). *See California Indus. Prod., Inc.*, 436 F.3d at 1351 ("Section 1625(c) only applies where Customs *has issued* an interpretive rule or decision.") (emphasis added").

But even more convincing is the fact that if one were to assume that the pair of 1997 denied protests, the hundreds of so-called liquidation decisions, and the six intensive examinations were classified as §1625(c)(1) "interpretive rulings or decisions,"

to the extent these actions occurred after July 29, 2001, they are made invalid by the

Revocation Ruling, effective on that date.[34]  Therefore, Plaintiff's argument that the 1997

protest decisions, liquidation decisions, and six intensive examinations trigger the

provisions and protections of the statute are meritless.  Accordingly, the Court need not

reach the issue of whether Kahrs has demonstrated the other two elements of

§ 1625(c)(1) because Plaintiff cannot meet the first element as a matter of law.

        *b.*      *Section 1625(c)(2)*

Kahrs fails to achieve success on its 19 U.S.C. § 1625(c)(2) claims as well.  In order

to prevail, Kahrs must establish at least four things.  First, it must demonstrate there

was a "treatment previously accorded by the Customs Service."  *Id.* § 1625(c)(2).  That is,

it must show what specific entries of Kahrs' hardwood flooring products were

previously classified under the desired tariff subheading for "parquet panels."  Second,

Plaintiff must prove that the subject entries at issue here are "substantially identical

---

[34]To summarize, Customs altered its position with respect to the classification of certain engineered floor panels with a face ply containing multiple strips from "parquet panels" under heading 4418 HTSUS to "plywood" under 4412 HTSUS.  In order to revoke certain established treatment and ruling letters (*e.g,* HQ 962031, NY 806603, NY 806462, and NY 832721), Customs complied with § 1625(c) and published notice of its intention in the *Customs Bulletin* on December 20, 2000.  *See* 34 Cust. Bull. 51. Thereafter, Customs finalized its revocation and it became effective on July 29, 2001.  *See* 35 Cust. Bull. 22.  *See also* Undisputed Material Facts ¶¶33-36, *supra.*  Kahrs' agent Sean Brennan denied any knowledge of the Revocation Ruling.  *See* Brennan Depo. Tr. 129-130.

transaction[s]" to the previous treatment. *Id.* Third, Plaintiff must prove that Customs

has made a "proposed interpretive ruling or decision" that would have the effect of

modifying the previous treatment with respect to the entries in question. *Id.* Fourth,

Plaintiff must demonstrate that the proposed interpretive ruling or decision violated the

notice and comment requirements of this statute. *See id; see also Int'l Custom Products,*

*Inc.*, 2009 WL 205860, at *6.

The phrase "treatment previously accorded" is not defined in the statute. *See* 19

U.S.C. § 1625(c)(2). Customs, however, promulgated regulations specifying the

definition of "treatment," which provides that

> (i) There must be evidence to establish that:
>
> > (A)  There was an actual determination by a Customs
> > officer regarding the facts and issues involved in the
> > claimed treatment;
> >
> > (B)  The Customs officer making the actual
> > determination was responsible for the subject matter
> > on which the determination was made; and
> >
> > (C)  Over a 2-year period immediately preceding the
> > claim of treatment, Customs consistently applied that
> > determination on a national basis as reflected in
> > liquidations of entries or reconciliations or other
> > Customs actions with respect to all or substantially all
> > of that person's Customs transactions involving
> > materially identical facts and issues.

*See* 19 CFR § 177.12(c)(1)(i). Customs explicitly states that in rendering its

determination of whether a prior "treatment" existed, it "will give no weight whatsoever to informal entries and to other entries or transactions which Customs, in the interest of commercial facilitation and accommodation, processes expeditiously and without examination or Customs officer review." *Id.* at § 177.12(c)(1)(ii). Finally, Customs makes clear that the evidentiary burden lies on the party seeking to establish the existence of a treatment. *See id.* § 177.12(c)(1)(iv).

Honing in on the first statutory requirement, Kahrs argues that Customs made "hundreds of liquidations" each year from "September 2001 to August 2006" of its hardwood flooring products and classified them under 4418.30.00 HTSUS. (Pl.'s Mot. SJ 17-22.) Though conceding that many of the "hundreds" of the entries were entered under "by-pass" procedures[35] and therefore ineligible for § 1625(c)(2) treatment per the Federal Circuit's holding in *Motorola, Inc. v. US*, Kahrs argued that Customs did in fact examine a "sampling" of its entries and did determine that the goods were properly classified and entered under 4418.30.00 HTSUS. (*Id.* (*citing Motorola, Inc. v. U.S.*, 509

---

[35]An entry that was liquidated under "by-pass" procedures means that Customs liquidated the merchandise as entered without specific physical inspection of the goods or a review of the entry paperwork by an import specialist or inspector. Due to the enormous volume of goods that are imported each year, and as an incentive to importers that are believed to maintain a high-level of compliance with the Customs laws, CBP employs such procedures in order to conform with the informed compliance concepts enshrined in the Mod Act. *See* Duvall Dec'l. ¶31; CUSTOMS LAW & ADMINISTRATION § 5.1 (3d ed. 2007).

F.3d 1368 (Fed. Cir. 2007).)

The Federal Circuit in *Motorola* held that Customs' rule, which excludes entries not examined or reviewed by a Customs official for purposes of § 1625(c)(2) "treatment"—bypass entries—was "'a permissible construction of the statute' and warrants deference." *Motorola*, 436 F.3d at 1366 (*quoting Chevron USA, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984)). Following an analysis of the evidence presented, the Court holds that of Kahrs' 1867 entries at issue here, all but the 12 entries described below were properly excluded from consideration here because they were bypass entries and not subject to an examination or review by an import specialist sufficient to constitute § 1625(c)(2) "treatment." *See id;* 19 C.F.R. § 177.12(c)(1)(ii). *See also* Undisputed Material Facts, II.B., *supra,* ¶¶39-49, 56, 61. The party claiming treatment must demonstrate that it has occurred, and Plaintiff has failed to do so here.

Beyond these excluded 1855 bypass entries, Kahrs specifically cites to 12 entries that were allegedly examined by Customs and found to be compliant as to its classification. (Pl.'s Mot. SJ 18-19; Pl.'s Opp. Br. 3-5.) Based on the record evidence, however, the Court has determined that of these 12 entries,

- 6 entries[36] were solely identified as "paper" entries (the "paper entries") and had their "entry summary" data (CF-7501) reviewed by a Customs

---

[36]Entry Nos. 201-3042459-9, F23-0114325-1, F23-0114725-2, F23-1145004-3, F23-0115067-8, and F23-0115182-5.

import specialist (Undisputed Material Facts, II.B., *supra*, ¶46);

- 1 entry,[37] identified as "paperless bypass" (the "paperless bypass entry"), had its "entry summary" data reviewed by a Customs import specialist (*Id.*); and

- 5 entries[38] underwent a cargo examination (the "cargo examination entries") of one kind or another (Undisputed Material Facts, II.B., *supra*, ¶56).

First, regarding the 6 "paper entries" and the single "paperless bypass entry,"

the evidence shows that a Customs import specialist reviewed the "entry summary

data"—information provided to CBP on a Customs Form 7501 by the importer. *See*

Undisputed Material Facts II.B., *supra*, ¶¶46, 61. This type of "review" by the CBP

import specialist in large measure consists of a "comparison of the invoice description

to the entered classification, without an actual physical review of samples or any other

information . . . ." Duvall Decl. ¶¶37, 36, 38-40; CBP ITRAC Report (Pl.'s Mot. SJ, Ex.

12). Because CBP did not sample the merchandise of these 6 entries and specifically

ascertain their correct classification, there was no "actual determination by a Customs

---

[37]Entry No. 399-0800233-8.

[38]Interestingly, regarding the 5 entries and entry no. 201-3042459-9—which Kahrs maintains were subject to "intensive examination" and the Government concedes underwent some form of cargo examination—are listed in the spreadsheet attachment to the Duvall Declaration as "Paper bypass" (Entry Nos. 701-5112456-0 and 399-0801291-5), "Paperless electronic invoice" (Entry Nos. 399-0803895-1 and 399-0802301-1), and "Paper" (Entry No. 201-3042459-9). Entry number 399-0808440-1 is inexplicably missing from the spreadsheet attachment. *See* Duvall Decl. p.7 and Attach.

officer regarding the facts and issues involved in the claimed treatment" within the meaning of 19 CFR § 177.12(c)(1)(i). Accordingly, these particular entries cannot bind CBP as to a particular classification and be considered a treatment for § 1625(c)(2) purposes.

Plaintiff cites to a Treasury Department directive regarding the 2002 amendments of part 177, stating "the mere fact that Customs does not examine the merchandise does not mean that an action leading to a treatment cannot occur, because other actions by Customs, such as a review of the entry documentation . . . can constitute adequate evidence of the existence of a treatment." T.D. 02-49, 67 Fed. Reg. 53,483, 53,492 (2002); *see* (Pl.'s Mot. SJ 19; *see also* Pl.'s Opp. Br. 9). Kahrs, however, is over-relying on CBP's response to a commenter's query. Indeed, in the preceding lines to the above quote, CBP notes that "the key issue in determining whether a treatment exists is whether, and if so *the manner in which, Customs has taken action on past transactions*." 67 Fed. Reg. at 53,492 (emphasis added). The evidence that Plaintiff has marshaled is woefully inadequate to demonstrate that CBP "made an actual determination" with respect to Kahrs' preferred classification of its hardwood floor panels. *See* 19 CFR § 177.12(c)(1)(i). Customs performed no such act. Mere perusal of entry summary data is hardly the type of entry-specific classification analysis that a Customs import specialist undertakes, nor is it the type of act contemplated by the

plain language of § 177.12(c)(1)(i).  Again, Kahrs shoulders the burden to summon

evidence that treatment upon which it relies actually exists.  *See* 19 CFR

§ 177.12(c)(1)(iv).  On these 6 entries, it has failed to do so.

Now turning to the 5 cargo examination entries, Plaintiff has referenced CBP's

ITRAC Report as demonstrable proof that Customs intensively examined the

merchandise in these 5 entries and confirmed their proper classification under

4418.30.00 HTSUS.  The evidentiary basis for Plaintiff's assertion is the column labeled

"Import Specialist Comments" data field from the ITRAC Report.  Kahrs relies on this

data to shows that its imports were found by an import specialist to be "OK" or

compliant.  As such, Plaintiff contends the entries were found to be properly classified

and Customs' subsequent liquidation confirms this assumption.  (*See* Pl.'s Opp. Br. 2-9;

Pl.'s Reply 5-6, 11-15.)  Thus, according to Plaintiff's theory, this official act by Customs

forms the "treatment" upon which Kahrs may rely.

First, regarding the cargo exams or intensive exams generally, CBP's James

Swanson, Chief, Cargo Release Branch, testified that some of Kahrs' entries were

randomly selected for examination by CBP's computer system for what is known as a

"stratified compliance exam" or a "supply chain measurement."  Swanson Depo. Tr.

33, 43-44, 75, 91.[39] These entries are random computer-system selections of goods for

examination and are not based upon any suspicion of illegality. *Id.* at 75. When these

random cargo exams are generated, they are "usually . . . limited to one entry line," of

merchandise. *Id.* at 75, 84-85. Next, the full physical inspection or exam of the entry

may include both a security exam as well as a general trade exam. *Id.* at 76. The

physical exams may also be a "non-intrusive" type of exam in which the container or

merchandise is subjected to an x-ray or scanner. *See id.* at 120-21. A general trade

exam would typically include a review of the entry compared with the commercial

invoice and other import documents. *Id.* at 76, 92-93. During a trade exam, the

inspection team reviews the particular classification of the merchandise in order to

ensure themselves that the physical goods "match the description provided on the

documents." *Id.* at 120-21, 93. A Customs import specialist *may or may not* be part of

the team that conducts these types of inspections. *Id.* at 123. The Customs inspectors

may look at the classification of the merchandise, in order to determine the accuracy of

the product description, but "[t]hey're not classification experts." *Id.* at 120. The

inspectors' job is to look at the freight description and match it with the imported

product. *Id.* Primarily, the inspectors are looking for "trade fraud . . . [and] things that

_____

[39]*See also* CBP Website: *Compliance Measurement (CM) Program Overview* at
http://www.cbp.gov/xp/cgov/trade/trade_programs/trade_compliance/compliance_mea
sure.xml (*last visited* Sept. 14, 2009).

are restricted or prohibited [from importation]." *Id.* at 122.

The "Import Specialist Comments" column of the CBP ITRAC Report for Entry 701-5112456-0 contains the notation "OK COMPLIANT." *Id.* The "Remarks" column indicates, among other things, the code "ISNI"—Import Specialist Not Involved—which, according to Customs, indicates that no import specialist was involved in the cargo examination. *See* Undisputed Material Facts, II.B., *supra,* ¶¶56, 64-66. Mr. Swanson also testified that the information contained in the "Import Specialist Comments" column, here "OK COMPLIANT," could have been entered at a date *after* the cargo examination. *See* Swanson Depo. Tr. 130-132. Generally, however, data recorded in the "Import Specialist Comments" field of the ACS, which was then replicated in the CBP ITRAC Report, is recorded by an import specialist. *Id.* at 89-90. Similarly, the "Import Specialist Comments" field on the ITRAC Report for Entry 399-0801291-5 also notes "OK COMPLIANT." However this record neither confirms nor excludes the presence of a customs import specialist during the cargo examination. *See* Swanson Depo. Tr. 90-102.

The Court finds that the notation "OK COMPLIANT" does not have any particular significance relative to the propriety of the classification of the merchandise and, in fact, could refer to an array of criteria, such as that the goods match the product description, or that no contraband was found, or that the quantities match up.

Additionally, as the CBP ITRAC record indicates that no import specialist was involved in the actual physical inspection of Entry No. 701-5112456-0, this Court finds it difficult to ascertain how there could be, as Kahrs maintains, an "actual determination by a Customs officer regarding the facts and issues involved in the claimed treatment." 19 CFR § 177.12(c)(1)(i). Moreover, based on the totality of the evidence presented, it appears that the cargo exams to which these two entries were subject, were engineered for routine, random security and trade purposes. There is no evidence that Customs reviewed, ascertained or approved the classification of these entries.

Regarding the evidence presented on Entries 399-0803895-1 and 399-0802301-1, the CBP ITRAC Report data indicates that import specialists were not involved in either cargo exams, the latter entry due to geographical inaccessibility. *See* Undisputed Material Facts, II.B., *supra*, ¶¶64-65. Additionally, the cargo exam remarks field for Entry 399-0802301-1 indicates "NO ANOMALIES PRESENT." Customs explained that such a notation refers to the nonintrusive inspection results. *See* Swanson Depo. Tr. 117. In other words, the finding of no anomalies "wouldn't really have any bearing on what the classification or what the description of the merchandise was." *Id.* at 117-118.

Finally, with respect to Entry 399-0808440-1, the "Import Specialist Comments" field of the CBP ITRAC Report indicates "SUMMARY LINE COMPLIANT MARKING

CERTIFICATION ACCEPTED." Customs explained that this entry, which was subject to a security and trade exam, was initially found to be noncompliant for country-of-origin marking purposes. *See* Undisputed Material Facts, II.B., *supra,* ¶¶76-78. Upon Kahrs' correction of this problem, a Customs official apparently recorded a note that the submitted marking certification was then acceptable and this entry was therefore compliant. *See* Swanson Depo. Tr. 31-32; 42-43; 78:16-79:4. Nowhere does the evidence indicate that Customs in fact reviewed the classification of this entry or approved Kahrs' classification.

In short, when the CBP ITRAC Report data is analyzed in its proper context in toto, it is evident to this Court that none of the exams, intensive or otherwise, were of such a quality as to amount to an approval of Kahrs' preferred classification. Indeed, Plaintiff assumed that, because it had never been challenged on its use of 4418.30.00 HTSUS before August 2006, it must have been acting correctly. *See, e.g.,* Brennan Depo. Tr. 161-63. Informed compliance, however, is proactive and cannot function on such an assumptive practice. *Cf. Esso Standard Oil Co. (PR) v. United States*, 559 F.3d 1297, 1307 (Fed. Cir. 2009) (Importers are presumed to know the customs law.)

The Federal Circuit held in *Boen Hardwood* that certain engineered wood

flooring, which this Court finds is practically identical[40] with some of Kahrs' imported flooring, was classifiable as "plywood" under heading 4412 HTSUS. *Boen Hardwood*, 357 F.3d at 1265. *Boen Hardwood* was handed down by the Federal Circuit in February 2004.[41] Apparently oblivious to this ruling, Kahrs continued to classify its hardwood

---

[40]The merchandise in *Boen Hardwood* was described as "hardwood flooring made up of three layers of wood in which the grain of the middle layer is perpendicular to the grain of the two outer layers." *Boen Hardwood*, 27 CIT at 41. The top layer was "composed of strips of hardwood measuring approximately ⅛ inch thick and 2¾ inches wide." *Id.* at 41-42. "The center layer consist[ed] of spruce slats or strips" which were "laid lengthwise" and "with their grains running perpendicular to the grain of the wood comprising the top and bottom layers." *Id.* at 42. The bottom layer was also comprised of "spruce strips ⅛ inch thick and 2¼ to 2¾ inches wide." *Id.* These three layers were laminated, *i.e.*, bonded together, using adhesives and pressure to make a single panel. *Id.* at 41 n.2. The panels were continuously shaped with tongue and groove along its edges and ends and was imported in standard sizes of "5½ inches wide, 7 feet 2 ⅝ inches long, and approximately ⅝ of an inch thick." *Id.* at 41. *Compare with* Kahrs' 15 mm 2-strip flooring products, Undisputed Material Facts, II.B., *supra*, ¶¶19-29.

[41]Kahrs makes the excuse, through its agent Mr. Sean Brennan, that it was "not aware" of the Federal Circuit's *Boen Hardwood* decision, the Revocation Ruling, and their applicability to some of its hardwood flooring products. *See, e.g.*, Brennan Depo. Tr. 129-30; Brennan Dec'l. 1 ¶¶16 & 17; Brennan Decl. 2 ¶17; *see also* Pl.'s Concise Statement of Material Facts Pertaining to the First, Second, Third, Fourth, and Sixth Causes of Action in the Compl. (Docket #104) ¶¶15, 63. The Court finds little sympathy with the Plaintiff on this accord. This court has instructed that

> ignorance of our customs laws does not serve as an excuse for a failure to comply with the requirements thereof. . . .The principle of law announced in the maxim *ignorantia legis neminem excusat . . .* is sanctioned by centuries of experience. Anyone dealing with the United States customs authorities is presumed to have full knowledge of all laws and regulations applicable thereto.

flooring products as "parquet" under 4418.30.00 HTSUS.

Notwithstanding *Boen Hardwood*, Kahrs maintains that three of its cargo exams—Entry Nos. 399-0803895-1, 399-0802301-1 and 399-0808440-1—occurred after this decision. Thus these three exams, plus the hundreds of liquidations that followed, are proof that a "treatment" was established by Customs. *See* Pl.'s Opp. Br. 14-15.

First, for the same reasons discussed above, because no § 1625(c)(2) treatment was created by the three post-*Boen Harwood* Customs cargo inspections, the notice and comment provisions of § 1625 are inapplicable.

Second, the other fatal flaw in this treatment argument is that Customs was incapable of limiting the Federal Circuits' *Boen Hardwood* precedent without conforming to the prescribed statutory procedures outlined by Congress under § 1625(d), whereby Customs can seek to "limit the application of a court decision." *See* 19 U.S.C. § 1625(d).[42] To be sure, Customs is bound by the Federal Circuit's statutory construction of the scope of heading 4412 HTSUS, set out in *Boen Hardwood. See Meuwissen v. Department of Interior*, 234 F.3d 9, 14 (Fed. Cir. 2000) ("The Agency is

---

*Pac. Customs Brokerage Co. v. United States,* 28 Cust. Ct. 385, 388 (1952) (citation omitted). Moreover, while ignorance may serve as an explanation, it is particularly galling that this excuse is proffered by Plaintiff's counsel in light of the above maxim. Further, considering the fact that Kahrs' previous legal counsel participated in the *Boen Hardwood* matter under the suspension calendar and test case designation, and excuse of ignorance is even less justified. *See* Undisputed Material Facts, II.B., *supra,* ¶¶68-71.

[42]The Court takes no position as to the Constitutionality of 19 U.S.C. § 1625(d).

bound to follow the law as elucidated by the courts."); *Sea-Land Service, Inc. v. U.S.*, 239 F.3d 1366, 1373-74 (Fed. Cir. 2001) ("Customs is merely implementing this court's interpretation of [the statute], an interpretation that . . . Customs is required to follow."). Accordingly, when Customs issued its CF-29s in August 2006, it was merely implementing the interpretive rule handed down by the Federal Circuit in *Boen Hardwood*. And when a handful of Kahrs' entries underwent CBP stratified cargo exams following the publication of *Boen Hardwood*, Customs, by that act alone, could not alter this judicial precedent by means of establishing a § 1625(c)(2) treatment.

Therefore, under the circumstances revealed in this case, it is not legally possible for a "treatment" to have existed between Kahrs and Customs. Accordingly, Plaintiff cannot prevail on its § 1625(c)(2) claim. The Court declines to address the other aspects of Kahrs' § 1625(c)(2) claim, as moot and, in any event, unavailing. In light of the foregoing analysis, Plaintiff's motion for summary judgment on its first cause of action is DENIED. The Government's Cross-Motion for summary judgment in this regard is GRANTED.

### E. Summary Judgment—Second Cause of Action

The Court now turns to the parties' cross-motions for summary judgment on Plaintiff's Second Cause of Action. Plaintiff alleges that on August 16, 2001, CBP impermissibly revoked an "established and uniform practice" ("EUP"), which for years

allowed for the duty-free importation of engineered hardwood flooring panels, throughout the U.S., under subheading 4418.30.00 HTSUS, as parquet flooring panels. (Compl. ¶¶30-39.) The EUP was created when CBP liquidated "hundreds" of duty-free entries of "similar or identical" engineered hardwood flooring products that Kahrs and other importers throughout the U.S. imported under subheading 4418.30.00 HTSUS. (*See id.*) Kahrs charges that beginning with the August 16, 2006 CF-29,[43] CBP purported to impose a higher duty for this merchandise (from duty free to 8% *ad valorem*). Kahrs contends that, because this tariff rate increase was implemented without publication and comment, pursuant to 19 U.S.C. § 1315(d) and 19 C.F.R. §§ 177.10(c) & (e), it was illegal. (*See id.* at ¶¶36-39; Pl.'s Mot. SJ 2d 13-14.)

The Government contends that § 1315(d) is inapplicable because: (i) the Secretary of the Treasury (or his designee) did not declare that an EUP existed for engineered wood flooring panels; (ii) where a judicial decision requires a change in an EUP, the statute is inapplicable; (iii) Kahrs has failed to demonstrate that a *de facto* EUP existed; and (iv) any *de facto* EUP, if it existed at all, was extinguished before the entry of Kahrs' subject merchandise. (Def.'s X-Mot. SJ 2d 6-23.)

1. <u>Analysis</u>

---

[43]Notices of Action issued to Kahrs: Entry # 399-0808699-2 on 8/16/06; Entry # 701-5216140-5 on 10/3/06; Entry # 701-5216163-7 on 10/11/06; Entry # 701-5216149-6 on 10/11/06; Entry # 399-0411896-3 on 10/17/06; and Entry # 399-0807626-6 on 11/27/06.

a.  *Section 1315(d)*

Section 1315(d) sets out the publication requirement for administrative rulings that result in higher duty rates.  It states that

> No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the *Federal Register* of notice of such ruling.

19 U.S.C. § 1315(d).  The statute's plain language bars the imposition and collection of duty increases where an EUP exists charging a lower tariff rate on the particular merchandise, unless the higher rate has been fixed by an administrative ruling, notice of which has been furnished in the *Federal Register*.  The corresponding regulations provide for comments:

> (c) *Changes of practice.*  Before the publication of a ruling which has the effect of changing an established and uniform practice and which results in the assessment of a higher rate of duty within the meaning of 19 U.S.C. 1315(d), notice that the practice (or prior ruling on which that practice was based) is under review will be published in the *Federal Register* and interested parties will be given an opportunity to make written submissions with respect to the correctness of the contemplated change.
>
>  . . .
>
> (e) *Effective dates.*  Except as otherwise provided in § 177.12(e)

> or in the ruling itself, all rulings published under the provisions of this part will be applied immediately. If the ruling involves merchandise, it will be applicable to all unliquidated entries, except that a change of practice resulting in the assessment of a higher rate of duty or increased duties shall be effective only as to merchandise entered for consumption or withdrawn from warehouse for consumption on or after the 90th day after publication of the change in the *Federal Register*.

19 C.F.R.§ 177.10(c) & (e). Thus, where an established and uniform practice exists, Customs must publish notice in the *Federal Register* before the existing EUP is altered to institute a higher rate of duty than was levied under the EUP. *See id.* Furthermore, where an EUP is altered to effect a higher rate of duty, Customs shall permit an opportunity for comment by interested parties and its ruling shall not apply to merchandise entered for consumption before the 90th day after *Federal Register* publication. *Id.* Plaintiff argues that an EUP existed of classifying and liquidating its hardwood flooring products under 4418.30.0000 HTSUS, which applied a duty-free rate to the subject merchandise, until this practice was altered starting with the August 16, 2006 CF-29, *etc.* As a result, Plaintiff contends that the CF-29s cannot apply to the entries at issue in this action because they were entered for consumption before any *Federal Register* publication. (Pl.'s Mot. SJ 2d 13-14, 25, 27.)

Normally, an EUP is established by a finding of the Secretary of the Treasury that such a practice exists. *See* 19 U.S.C. § 1315(d); *see also Jewelpak Corp. v. United States,* 297

F.3d 1326, 1332 (Fed. Cir. 2002) ("[S]ection 1315(d) speaks only in terms of findings made by the Secretary of the Treasury."). In this case, there is no dispute: there was no such finding by the Secretary of the Treasury. *See* Revocation Ruling, 35 Cust. Bull. 22. Accordingly, in so far as Plaintiff argues that the Secretary of the Treasury had found that there existed an EUP with respect to its merchandise, this Court rejects such contentions. (*See* Def.'s X-Mot. SJ 2d 7-8; Pl.'s Reply 2d 5.) As was discussed earlier in this opinion, Customs unquestionably published the Revocation Ruling in the *Customs Bulletin* on May 30, 2001, which revoked any prior rulings and treatment by CBP that engineered wood flooring was classifiable as "parquet panels" under 4418.30.00 HTSUS. *See* Revocation Ruling, 35 Cust. Bull. 22. This publication also indicated no finding of an EUP in this regard and neither can Plaintiff point to no such a finding. *Id.* Therefore, starting with the Revocation Ruling at the end of May 2001, Kahrs had unambiguous notice that engineered wood floor panels would no longer be classifiable as "parquet" panels under 4418.30.0000 HTSUS.[44]

---

[44]Plaintiff's § 1315(d) argument also fails because the CF-29s (for the six subject entries in this lawsuit), which Kahrs claims are administrative rulings that impose higher duties, are not in this instance, actual "administrative ruling[s]." It has long been held that where a judicial decision mandates a change in an EUP, § 1315(d) is inapplicable. *See Sea-Land Service, Inc. v. United States*, 23 CIT 679, 689-90, 69 F. Supp.2d 1371, 1380 (1999) (*citing Westergaard, Berg-Johnsen Co. v. United States*, 17 Cust. Ct. 1, 3, (1946) (noting that § 1315(d) is limited to an administrative ruling changing an EUP of a lower duty rate, but does not apply where the higher assessment is due to a judicial decision)). Here, the CF-29s are more appropriately described as notices implementing

Plaintiff also argues that a *de facto* EUP exists subsequent to the Revocation Ruling and the *Boen Hardwood* decision. (Pl.'s Mot. SJ 2d 15-28.)

This Court held in *Heraeus-Amersil, Inc. v. United States*, that a plaintiff could show an EUP through actual uniform liquidations, even though the Secretary of the Treasury had made no "finding" that such a practice existed. 8 CIT 329, 335, 600 F. Supp. 221, 226 (1984). This so-called *de facto* EUP is determined where the court makes a finding that Customs consistently classified a particular type of merchandise under a specific category of the HTSUS prior to some distinct point in time. *See Atari Caribe, Inc. v. United States*, 16 CIT 588, 595, 799 F. Supp. 99, 106-07 (1992). The requirements for establishing a *de facto* EUP, however, are stringent. *Jewelpak Corp.*, 297 F.3d at 1332 (*citing Heraeus-Amersil, Inc. v. United States*, 795 F.2d 1575 (Fed. Cir. 1986)). These factors that a Court must consider prior to finding a *de facto* EUP are: "[1] the number of entries resulting in the alleged uniform classifications[; 2] the number of ports at which the merchandise was entered[; 3] the period of time over which the alleged uniform classifications took place[;] and [4] whether there had been any uncertainty regarding

the Federal Circuit's *Boen Hardwood* decision. *See Boen Hardwood*, 357 F.3d at 1266 (classifying engineered wood floor panels as "plywood" under heading 4412 HTSUS). Indeed, Customs specifically cited to "CAFC 03-1287," which is the *Boen Hardwood* decision, as the reason for denying Kahrs' protest on the subject entries. (*See* Compl., Ex. 1A (Protest No. 2704.07.101011).) Therefore, to the extent that Kahrs argues that the CF-29s were in fact "administrative ruling[s]" that improperly revoked its EUP, this Court finds such arguments unavailing.

the classification over its history." *Heraeus-Amersil, Inc. v. United States*, 9 CIT 412, 415-16, 617 F. Supp. 89, 93 (1985), *aff'd* 795 F.2d 1575 (Fed. Cir. 1986).

Kahrs argues that it can prove each *Heraeus-Amersil* element and that a *de facto* EUP can be established. (Pl.'s Mot. SJ 2d 17.) The Government responds that Kahrs has, in fact, failed to present sufficient evidence that a *de facto* EUP exists. (*See* Def.'s X-Mot. SJ 2d 10-15.) Kahrs replies that it need not show that CBP made a deliberate or intentional decision to establish an EUP but need only show "uniform liquidations among many ports over a period of time." (Pl.'s Reply SJ 2d 8-9 (*citing Arbor Foods, Inc. v. United States*, 9 CIT 119, 607 F. Supp. 1474 (1985)).) The Government, however, argues that the aim of § 1315(d) is to promote uniformity in classification matters. *See* Def.'s Reply SJ 2d. 7; *Heraeus-Amersil*, 8 CIT at 331. Thus, a *de facto* EUP is predicated on the deliberate and concerted determination by CBP officers, acting in their official capacity, classifying particular merchandise under the expectation of uniform national application. (*See* Def.'s X-Mot. SJ 2d 13-14.)

In this case, the vast majority of the entries were classified as having been entered under "by-pass" procedures. This Court is of the view that finding a *de facto* EUP through automatic bypass—wherein entries are passed-through and liquidated without examination or deliberate classification and liquidated as entered—would undermine both the Congressional intent behind § 1315(d) and the principle established by

*Heraeus-Amersil*, which is that an EUP must be based upon *some* overt, affirmative, official act by CBP and not upon an automated pass-through procedure. This Court above determined that CBP *pro forma* liquidated the vast majority of Kahrs' merchandise duty-free as entered by Kahrs. Indeed, of the 1867 entries made by Kahrs during the relevant period, only the entry summary for 7 entries were reviewed by an import specialist and this "review" occurred at only 3 out of 327 CBP ports. Moreover, an "entry summary review" is far from the kind of deliberate, intentional decision made after an examination of the imported merchandise and supporting documents for purposes of determining its proper classification. Finally, as was discussed in Part II.D.3.b., the 5 entries that were the subject of cargo examinations were revealed to have been security or selectivity examinations where no binding classification determinations were made. In the final analysis, it is clear that Kahrs cannot demonstrate that *any* of its entries, but especially those between July 29, 2001 and August 16, 2006, had in fact been overtly or affirmatively classified by CBP import specialists. As a result, Kahrs may not rely on them to establish a *de facto* EUP.

Because Kahrs fails in this regard, the Court need not address in the abstract the arguments raised about whether the *de facto* EUP was extinguished (*see* Def.'s X-Mot. SJ 2d 16-23) or whether Kahrs was the sole importer of engineered wood flooring panels (*see* Def.'s X-Mot. SJ 2d 15-16). Accordingly, Plaintiff's motion for summary judgment

of its second cause of action is DENIED. Defendant's motion for summary judgment on Plaintiff's second cause of action is GRANTED.

III. CONCLUSION

Based on the discussion set forth above, the Court is entering an Order dismissing from Plaintiffs' Complaint, the Seventh Cause of Action and the "reasonable care" claims. The Court is also entering an Order denying Defendant's motion to strike.

Furthermore, based upon the foregoing, the Court is entering an Order granting Defendant's motion for summary judgment on the Third, Fourth, and Sixth Causes of Action of Plaintiff's Complaint. The Court is also entering an Order granting Defendant's cross-motions on the First and Second Causes of Action of Plaintiff's Complaint and denying Plaintiff's motions to the same.

ORDER

Upon consideration of Defendant's motion to dismiss and motion to strike, and Plaintiff's motion for leave to file a sur-reply, and all other papers and proceedings in this case, for the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's motion for leave to file a sur-reply is DENIED; it is further

**ORDERED** that Defendant's motion to strike is DENIED; it is further

**ORDERED** that Defendant's motion to dismiss is GRANTED; it is further

**ORDERED** that the claims in the Seventh Cause of Action to Plaintiff's

Complaint be, and hereby are, dismissed; it is further

ORDERED that all the "reasonable care" claims within Plaintiff's Complaint be, and hereby are, dismissed.

And upon consideration of Plaintiff's and Defendant's cross-motions for

summary judgment on the First and Second Causes of Action and Defendant's motion

for summary judgment on the Third, Fourth and Sixth Causes of Action to the

Complaint, and all other papers and proceedings in this case, for the foregoing reasons,

it is hereby

ORDERED that Defendant's cross-motions for summary judgment on the First and Second Causes of Action of Plaintiff's Complaint are, GRANTED; it is further

ORDERED that Plaintiff's motions for summary judgment on the First and Second Causes of Action of Plaintiff's Complaint are, DENIED; it is further

ORDERED that Defendant's motion for summary judgment on the Third, Fourth and Sixth Causes of Action of Plaintiff's Complaint is, GRANTED; it is further

ORDERED that all motions for oral argument are DENIED; and it is further

ORDERED that within 14 business days of the entry of this Order, the parties, following a meet and confer, shall submit to this Court a proposed scheduling order regarding further proceedings in this case. Pending the submission of the proposed scheduling order, the parties shall not file any motion in this court without the express written permission of this Court.

                                                                /s/ Gregory W. Carman  
                                                          Gregory W. Carman


Dated:        September 18, 2009
                New York, New York

**ERRATA**

Please make the following change to *Kahrs International, Inc. v. United States*, No. 07-00343, Slip Op. 09-101:

- page 1, counsel list: add after "(<u>Mikki Cottet</u>)" and before "for Defendant" the following: "; Yelena Slepak, Senior Attorney, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs & Border Protection, of counsel,"

September 18, 2009.